706 A.2d 1060

**Ricardo D. ZAPPONE et al.**

v.

**LIBERTY LIFE INSURANCE COMPANY et al.**

**No. 133, Sept. Term, 1995.**

Court of Appeals of Maryland.

March 11, 1998.

48

Roger D. Luchs (Michael G. Blackstone, Stephen K. Levey, King & Nordlinger, L.L.P., on brief), Washington, DC, for petitioners.

Dennis W. Carroll (J. Joseph Curran, Jr., Atty. Gen., Christina Gerstung Beusch, Asst. Atty. Gen., on brief), Baltimore, amicus curiae.

Gary Howard Simpson, Bethesda, for respondents.

James M. Brault (Brault, Graham, Scott & Brault, on brief), Rockville, for respondents.

Argued before MURPHY, C.J.,* and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI,* BELL and RAKER, JJ.

---

* Murphy, C.J, and Karwacki, J., now retired, participated in the hearing of this case while active members of this Court; after being recalled

ELDRIDGE, Judge.

We issued a writ of certiorari in this case to determine if the provisions of the Insurance Code pertaining to unfair trade practices by insurers and their agents provide the exclusive or primary remedy for alleged acts of fraud, negligent misrepresentation, and negligence by an insurer or agent in connection with the sale of insurance. The court below answered this question in the affirmative, holding that an aggrieved insured was precluded from maintaining a common law tort action against an agent and an insurer without first invoking and exhausting the administrative and judicial review remedy provided by the Insurance Code. We shall reverse.

## I.

Before turning to the facts of this case, it will be useful to review briefly the pertinent provisions of the Insurance Code.

The General Assembly, by Ch. 757 of the Acts of 1947, enacted a new subtitle as part of the Insurance Code, consisting of fifteen new sections, and titled "Unfair and Deceptive Practices." At the time the present litigation was instituted and decided by the court below, this subtitle was codified in Maryland Code (1957, 1994 Repl.Vol.), Art. 48A, subtitle 15, §§ 212–240J, denominated "Unfair Trade Practices." [1]

The purpose of the 1947 enactment, as set forth in Ch. 757, and codified as Art. 48A, § 212, was as follows:

" § 212. **Purposes of subtitle.**

"The purpose of this subtitle is to regulate trade practices in the business of insurance in accordance with the intent of

---

pursuant to the Constitution, Article IV, Section 3A, they also participated in the decision and the adoption of the opinion.

1. The General Assembly, in Ch. 25 of the Acts of 1997, effective October 1, 1997, recodified these provisions in Code (1997), Title 27, §§ 27–101 through 27–911, of the Insurance Article, denominated "Unfair Trade Practices and Other Prohibited Practices." We shall in this opinion use the code citations in effect when the case was decided by the circuit court, namely Art. 48A, subtitle 15. Unless otherwise indicated, all references in this opinion to statutory sections are to those set forth in Art. 48A.

Congress as expressed in the Act of Congress of March 9, 1945 (Public Law 15, 79th Congress, ch. 20, 50 U.S. Stat. at Large 33), by defining, or providing for determination of, all such practices in this State which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined."

The General Assembly has from time to time added some provisions to the 1947 statute. Nevertheless, the substance of the 1947 enactment has largely remained intact.

Some of the provisions of the Unfair Trade Practices subtitle which may be pertinent to the issue in this case are as follows. Art. 48A, § 217, prohibits any person from, *inter alia*, making or causing to be made any "statement misrepresenting ... the benefits or advantages" because of any insurance policy. Section 218, *inter alia*, prohibits a statement or representation with respect to the conduct of insurance business "which is untrue, deceptive or misleading." Section 233(d)(1) makes it a "fraudulent insurance act" for a person to make, knowingly or willfully, "any false or fraudulent statement or representation ... with reference to any application for insurance." Section 216 authorizes the Insurance Commissioner to define unfair practices in the business of insurance in addition to those unfair practices defined in the subtitle.

The general administrative remedy for violations of the Unfair Trade Practices subtitle is contained in § 215. That section provides for charges of unfair trade practices to be made to the Insurance Commissioner, notices of hearings, intervention by interested persons, hearings before the Commissioner, the Commissioner's issuance of cease and desist orders, and judicial review of the cease and desist orders. Section 216 provides for an administrative hearing remedy with respect to practices not defined as unfair practices in the subtitle but determined by the Commissioner to be unfair trade practices. That section provides for injunctions if the unfair practice continues after a final administrative determination. Other sections of the Unfair Trade Practices subtitle contain specific remedial provisions for violations of the partic-

ular section involved. *See, e.g.,* § 230A (Commissioner can order monetary penalties and restitution if the section is violated); § 233 (criminal penalties); § 234AA(g) (fine imposed by the Commissioner); § 234C (Commissioner may order an insurer to accept a particular risk).

Moreover, Art. 48A, §§ 35–40, provide an administrative and judicial review remedy generally to enforce the provisions and purposes of the Insurance Code. Furthermore, Art. 48A, § 55, authorizes the Insurance Commissioner to revoke or suspend an insurer's license if the insurer "[v]iolates any provision of this article" or "[k]nowingly fails to comply with any lawful rule, regulation or order of the Commissioner," and § 55A authorizes monetary penalties and restitution in lieu of or in addition to revocation or suspension.

## II.

As the case was decided in favor of the defendants upon their motions to dismiss and for summary judgment, we set forth the facts in the light most favorable for the plaintiffs. The basic facts are as follows.

The plaintiffs and petitioners in the present case are Ricardo D. Zappone and Print–A–Copy, Inc. Zappone is the sole shareholder of Print–A–Copy, a small business engaged in the printing, copying, and office supply trade in Montgomery County, Maryland. In addition to being sole shareholder, Zappone is also the president and an employee of Print–A–Copy. The respondents are Liberty Life Insurance Company, First Financial Resources, Inc., and William Ray Miller. First Financial is an independent insurance agency owned and operated by Miller and his wife. At all times relevant to this proceeding, First Financial was the licensed managing general agency and Miller was the licensed general agent for Liberty Life in the State of Maryland.

In March 1989, Miller and First Financial contacted Zappone concerning the purchase of life insurance from Liberty Life. Zappone, then 62 years of age, informed Miller that he wished to purchase a life insurance policy that, in addition to

yielding benefits in the event of his premature death, would build up a large cash value relatively quickly to provide funds for his anticipated retirement in approximately twelve years. Miller indicated that he would attempt to procure from Liberty Life a policy meeting these stated needs, and Zappone executed an application for life insurance with Liberty Life.

During the succeeding months, Miller described to Zappone a life insurance plan called the "Executive Wealth Builder II," which he indicated would meet Zappone's needs. This plan consisted of a life insurance policy with a face amount of $1,000,000.00 that could be used as a deferred compensation plan to accumulate sizable cash value in a short period of time. Using several of Liberty Life's computer-generated illustrations of policy performance, Miller told Zappone that the policy could be fully funded by a one time premium payment of $500,000.00, that no additional premium payments would be required in order for the policy to perform and accumulate cash value as represented, and that the policy would accumulate sufficient retirement funds within twelve years. In addition to the one-time $500,000.00 premium payment, Miller told Zappone that an additional payment of $10,000.00 in "earnest money" to act as a binder would be required to put the policy into force. Based upon these representations, Zappone agreed to purchase the policy.

At Miller's suggestion, Zappone financed the purchase of the policy through the use of a "split dollar" agreement between himself and Print–A–Copy. Pursuant to this arrangement, Print–A–Copy loaned Zappone $510,000.00 to pay the policy's premium, and Zappone granted Print–A–Copy a security interest in the proceeds of the policy up to the amount of the loan. Print–A–Copy obtained a loan from Maryland National Bank in the amount of $510,000.00, and assigned its security interest in the policy to the bank as security for the loan. Print–A–Copy agreed to this split dollar arrangement because Miller represented to Zappone that the interest paid by Print–A–Copy on the loan would be deductible from its tax returns on a yearly basis. After obtaining

the loan, Print–A–Copy delivered four checks totaling $510,-000.00 to Miller, representing payment of the policy premium.

In July 1989, Liberty Life issued an insurance policy in Zappone's name. The policy, however, called for the payment of monthly premiums instead of a one-time premium, as had been represented to Zappone by Miller and First Financial. Shortly thereafter, at First Financial's request, Liberty Life converted this policy to a single premium policy.

Subsequently, Zappone learned from his tax advisor that the amount of interest paid by Print–A–Copy on the loan from Maryland National Bank was not deductible on Print–A–Copy's tax returns, and that Miller's representations in this regard were not accurate. When confronted with this information, however, Miller continued to represent to Zappone that the interest payments were tax deductible.

In May 1990, Liberty Life notified Zappone by letter that Zappone's $510,000.00 premium payment exceeded, by $407,-034.48, certain maximum limits established by tax legislation enacted by Congress in 1988.[2] This letter advised Zappone that he would be taxed on any policy distributions in excess of the amount of premiums paid into the policy if his policy premiums exceeded the new maximum limits. The letter suggested several options that would satisfy the statutory requirements, including: (1) depositing the excess premium amount into an "advance premium deposit account," which would automatically pay the maximum allowable statutory amounts into the policy, while the interest on the account would be taxed annually, and Zappone could withdraw interest or principal at any time; (2) depositing the excess amount into a "side fund account," which would operate like an advance premium deposit account but the interest would be tax deferred and Zappone would not have access to the interest as it accrued; (3) refunding the excess amount to Zappone, which would require Zappone to pay an annual premium; or (4)

---

2. *See* Technical and Miscellaneous Revenue Act (TAMRA), 26 U.S.C. §§ 7702, 7702A.

keeping the entire amount in the policy, in which case he would be taxed on excess policy distributions as initially described in the letter. In addition, this letter stated that Liberty Life would automatically place the excess premium into an advance premium deposit account if Zappone failed to make an election by May 30, 1990. Upon receiving the notice from Liberty Life, Zappone contacted Miller for advice on how to proceed. Miller allegedly told Zappone not to worry about the letter, and that he would "take care of it." Believing that Miller was making the necessary arrangements, Zappone did not respond to Liberty Life's notice.

In July 1990, after receiving no response from Zappone, Liberty Life deposited the excess premium amount in an advance premium deposit account in accordance with its May notice to Zappone, and Liberty Life sent Zappone a letter to this effect. Upon receipt of this letter, Zappone again contacted Miller, who advised him to execute a "special side fund agreement." [3] Miller told Zappone that the creation of this agreement would solve any tax problems associated with the large premium amount and without creating new tax liabilities or reducing the policy's cash value. Relying on these representations, Zappone signed the special side fund agreement on July 30, 1990. Liberty Life acknowledged its receipt of this agreement in January 1991, and it switched the policy from one funded by an "advanced premium deposit" to one funded by a "special side fund agreement."

In May or June 1992, Zappone first learned from an estate planning specialist that the creation of the special side fund agreement, and the issuance of a monthly premium insurance policy, would prevent the policy he received from performing

---

3. A side fund agreement is a special interest bearing account from which annual premium payments are made for a life insurance policy to insure compliance with the requirements of the Technical and Miscellaneous Revenue Act (TAMRA), 26 U.S.C. § 7702A (1994). This agreement acts as an escrow account in that the funds deposited therein accrue interest and must be used to pay the annual premiums on the insurance policy which comply with the TAMRA rules for the policy.

as represented by Miller and Liberty Life unless substantial additional premiums were paid. Specifically, Zappone learned that at the end of the twelfth policy year, when he intended to begin withdrawing cash from the policy, the policy's cash value would be roughly $600,000.00, substantially less than the face value of the policy and the amount represented to him by Miller, and would be insufficient to fund his retirement.

Thereafter, Zappone filed a multi-count complaint in the Circuit Court for Montgomery County, alleging fraud, negligent misrepresentation, and negligence. The defendants were Miller, First Financial, and Liberty Life. The complaint was amended on two occasions, the second time on December 28, 1994, after the expiration of the three-year statute of limitations. The changes brought about by the second amended complaint were the addition of Print–A–Copy as a party plaintiff and the assertion of damage claims against the defendants arising from Print–A–Copy's inability to deduct, on its corporate tax returns, the interest paid on its loan from Maryland National Bank. The second amended complaint included eight counts. Counts I–IV included negligence and fraud claims by Zappone and Print–A–Copy against all three defendants. Counts V–VII included new fraud and negligence claims by Print–A–Copy alone against all three defendants. Count VIII included a negligence claim by Zappone alone against Liberty Life alone.

Following extensive discovery, all three defendants filed various motions for summary judgment and dismissal. The circuit court held a hearing on the motions on September 14 and September 18, 1995. Liberty Life's motion to dismiss count VIII was not opposed by the plaintiffs. After the hearing, the court granted Liberty Life's motion to dismiss count VIII. The court granted summary judgment for all three defendants as to counts V and VI on the ground that they were barred by the statute of limitations. The court specifically found that those counts, which were asserted for the first time in the second amended complaint, did not relate back to the filing of the initial complaint because they constituted new causes of action. With respect to the remaining

counts (I–IV and VII), the circuit court denied the defendants' motions for summary judgment but granted their motions to dismiss. The court determined that the remedial provisions of the Insurance Code constituted the exclusive remedy for all claims of unfair or deceptive trade practices by insurers or insurance agents in connection with the sale of insurance. The court ruled that, because the second amended complaint contained claims and raised issues expressly covered by these statutory provisions, the plaintiffs' sole remedy for these alleged violations was the administrative remedy before the Insurance Department. In support of this conclusion, the circuit court relied upon the decision of the Court of Special Appeals in *Vicente v. Prudential Ins. Co. of America*, 105 Md.App. 13, 658 A.2d 1106 (1995).

Thereafter, Zappone and Print–A–Copy timely appealed to the Court of Special Appeals. Prior to briefing and argument in that court, Zappone and Print–A–Copy filed a petition for a writ of certiorari in this Court, which we granted. *Zappone v. Liberty Life Ins.*, 341 Md. 313, 670 A.2d 465 (1996).

### III.

The case relied upon by the court below, *Vicente v. Prudential Ins. Co. of America, supra*, 105 Md.App. 13, 658 A.2d 1106, was a tort suit brought by two insureds against a health insurer and its agent, alleging fraud, negligent misrepresentation, and negligent supervision based on the agent's alleged misrepresentation that the insurer was licensed to sell insurance in Maryland and that the insurer met the capitalization requirements imposed by the Insurance Code and regulations. The plaintiffs in *Vicente* conceded that the wrongs alleged in their complaint are prohibited by the Unfair Trade Practices subtitle of the Insurance Code, Art. 48A, §§ 212–240J. The plaintiffs, however, had not invoked their administrative remedy under the Insurance Code. They argued that the Insurance Commissioner's jurisdiction under the Unfair Trade Practices subtitle and a court's jurisdiction over a common law tort action were fully concurrent, and that a complainant need not

first invoke and exhaust the administrative remedy under the Insurance Code before maintaining a common law tort action.

The Court of Special Appeals in *Vicente* rejected the plaintiffs' argument and held that the remedies set forth in the Unfair Trade Practices subtitle, along with §§ 55 and 55A of Art. 48A, are "exclusive." *Vicente*, 105 Md.App. at 23, 658 A.2d at 1111. The intermediate appellate court's exclusivity holding was chiefly based upon two of that court's prior decisions, *Veydt v. Lincoln Nat. Life Ins. Co.*, 94 Md.App. 1, 614 A.2d 1318 (1992), and *Magan v. Medical Mutual*, 81 Md.App. 301, 567 A.2d 503 (1989). The Court of Special Appeals in *Vicente* also relied upon the "general exhaustion of remedies rule ... that, 'where a statute provides a special form of remedy, the plaintiff must use that form [of remedy] rather than any other.'" *Vicente*, 105 Md.App. at 16, 658 A.2d at 1107, quoting *Bits "N" Bytes v. C & P Telephone*, 97 Md.App. 557, 573, 631 A.2d 485, 494 (1993), *cert. denied*, 333 Md. 385, 635 A.2d 425 (1994). The appellate court also relied upon this Court's opinion in *Muhl v. Magan*, 313 Md. 462, 545 A.2d 1321 (1988).

Turning to the present case, Zappone and Print–A–Copy argue that the Court of Special Appeals' decision in the *Vicente* case was erroneous, and that the circuit court erred in holding that the plaintiffs were required to invoke and exhaust their administrative remedy before the Insurance Commissioner. They contend that neither the plain language of Article 48A, §§ 212–240J, nor the legislative history of these provisions, indicate that the General Assembly intended that all claims alleging fraud or negligence by an insurer and/or its agents in the sale of insurance were exclusively within the province of the Insurance Commissioner to resolve. The plaintiffs argue that, under this Court's decisions, where a common law remedy and a statutory administrative remedy exist independently of each other, without any indication in either the statutory language or legislative history that the administrative remedy is exclusive or primary, the remedies are fully concurrent, and the claimant is not required to invoke and exhaust the administrative procedures prior to maintain-

ing a tort action in court.[4] Finally, the plaintiffs contend that the circuit court erred in holding that counts V and VI were barred by limitations.

The defendants point out that all of Zappone's and Print–A–Copy's claims fall within the purview of the Unfair Trade Practices Act, Art. 48A, subtitle 15, which provides an extensive administrative scheme for the regulation of unfair trade practices in the sale of insurance in Maryland. They contend that the administrative remedy is exclusive, and that the statute, by implication, repeals any common law tort remedy to the extent that an administrative remedy is provided. In support of their argument that the administrative remedy was intended to be exclusive, they point out that, under subtitle 15, an aggrieved claimant may file a complaint with the Insurance Commissioner, request an investigation and a hearing on the complaint, and, if dissatisfied with the Commissioner's resolution of the matter, obtain judicial review in the circuit court, with a further right of appeal to the Court of Special Appeals. The defendants note that the Legislature furnished the Insurance Commissioner with broad remedial powers to redress violations of the statute, such as the power to suspend or revoke licenses to sell insurance, to impose significant monetary penalties, to order restitution for each violation, and to issue cease and desist orders to prevent the unfair trade practices during the pendency of any investigation. The defendants conclude, based upon the extensive and compre-

---

4. The Maryland Insurance Commissioner, as *amicus curiae,* filed a brief in this Court supporting Zappone's and Print–A–Copy's position, and arguing that the Court of Special Appeals' decision in *Vicente v. Prudential Ins. Co. of America, supra,* is inconsistent with our prior decisions and the statutory language of the Insurance Code. According to the Commissioner, neither the language nor the legislative history of the Unfair Trade Practices subtitle supplant a consumer's right to sue an insurer and its agents for tortious conduct or beach of contract arising from the purchase of insurance coverage. Urging us to overrule *Vicente,* the Commissioner contends that, in situations where the Legislature does not expressly indicate that a special statutory administrative remedy is exclusive or primary, and where a plaintiff has an alternative judicial cause of action under the common law, the plaintiff has a choice as to which remedy to pursue.

hensive nature of the statute, that the circuit court correctly held that the administrative remedy was exclusive. The defendants also assert that Print–A–Copy's claims in counts V and VI were barred by limitations.

## IV.

### A.

Whenever the Legislature provides an administrative and judicial review remedy for a particular matter or matters, the relationship between that administrative remedy and a possible alternative judicial remedy will ordinarily fall into one of three categories.

■ *First,* the administrative remedy may be exclusive, thus precluding any resort to an alternative remedy. Under this scenario, there simply is no alternative cause of action for matters covered by the statutory administrative remedy.

■ *Second,* the administrative remedy may be primary but not exclusive. In this situation, a claimant must invoke and exhaust the administrative remedy, and seek judicial review of an adverse administrative decision, before a court can properly adjudicate the merits of the alternative judicial remedy. *See, e.g., McCullough v. Wittner,* 314 Md. 602, 613, 552 A.2d 881, 886 (1989) ("Under circumstances like these, where a plaintiff has both an administrative remedy and an independent judicial action, and the administrative agency's jurisdiction is deemed primary, it is appropriate for the trial court to retain, for a reasonable period of time, jurisdiction over the independent judicial action pending invocation and exhaustion of the administrative procedures"); *Md.-Nat'l Cap. P. & P. Comm'n v. Crawford,* 307 Md. 1, 18, 511 A.2d 1079, 1088 (1986) ("Once the administrative procedures are exhausted, the trial court may proceed [with both the independent judicial action and the administrative review action]; the plaintiff whose case is meritorious may be entitled to whatever relief is available under either the independent judicial action or the administra-

tive/judicial review remedy"); *Bd. of Ed. for Dorchester Co. v. Hubbard,* 305 Md. 774, 792, 506 A.2d 625, 634 (1986).

■ *Third,* the administrative remedy and the alternative judicial remedy may be fully concurrent, with neither remedy being primary, and the plaintiff at his or her option may pursue the judicial remedy without the necessity of invoking and exhausting the administrative remedy. *Md.-Nat'l Cap. P. & P. Comm'n v. Crawford, supra,* 307 Md. at 22–31, 511 A.2d at 1090–1094; *Bd. of Ed. for Dorchester Co. v. Hubbard, supra,* 305 Md. at 791, 506 A.2d at 633; *Md.-Nat'l Cap. P. & P. v. Wash. Nat'l Arena,* 282 Md. 588, 600, 386 A.2d 1216, 1225 (1978).

■ Which one of these three scenarios is applicable to a particular administrative remedy is ordinarily a question of legislative intent. *Md. Reclamation v. Harford County,* 342 Md. 476, 493, 677 A.2d 567, 576 (1996); *Md.-Nat'l Cap. P. & P. Comm'n v. Crawford, supra,* 307 Md. at 14–15 n. 5, 511 A.2d at 1086 n. 5; *White v. Prince George's Co.,* 282 Md. 641, 649, 387 A.2d 260, 265 (1978).[5] Occasionally, the General Assembly will expressly set forth its intent in this regard. For an example of express legislative intent with regard to each of these three categories, *see* Code (1957, 1996 Repl.Vol., 1997 Supp.), Art. 25A, § 5(U) ("The [administrative and judicial] review proceedings provided by this subsection shall be exclusive"); Code (1957, 1997 Repl.Vol.), Art. 41, § 4–102.1(k) (specifying that the remedy is primary by stating that "[n]o court shall entertain an inmate's grievance or complaint within the jurisdiction of the Inmate Grievance Office or the Office of Administrative Hearings unless and until the complainant has exhausted the remedies as provided in this section"); Code (1957, 1994 Repl.Vol.), Art. 48A, § 230A(f) ("Nothing con-

---

5. Where the alternative judicial remedy is one expressly authorized and protected by the constitution, however, the legislative intent underlying the statutory administrative remedy is not controlling. *See* Judge Chasanow's recent discussion of this point for the Court in *Md. House of Correction v. Fields,* 348 Md. 245, 256–261, 703 A.2d 167, 173–175 (1997).

tained in this section is intended to ... deprive any private right or cause of action to, or on behalf of any claimant or other person.... It is the specific intent of this section to provide an additional administrative remedy.... This section may not be construed to impair the right of any person to seek redress in law or equity for any conduct which is otherwise actionable").

While sometimes the Legislature will set forth its intent as to whether an administrative remedy is to be exclusive, or primary, or simply a fully concurrent option, most often statutes fail to specify the category in which an administrative remedy falls. Consequently, various principles have been applied by this Court to resolve the matter.

Ordinarily a statutory administrative and judicial review remedy will be treated as exclusive only when the Legislature has indicated that the administrative remedy is exclusive or when there exists no other recognized alternative statutory, common law, or equitable cause of action. *See, e.g., Bowman v. Goad,* 348 Md. 199, 202, 703 A.2d 144, 145 (1997) (because "no common law action lies for the recovery of taxes or governmental fees which the plaintiff has voluntarily paid under a mistake of law ... any statutorily prescribed [administrative] refund remedy is exclusive"); *Insurance Commissioner v. Equitable,* 339 Md. 596, 623, 664 A.2d 862, 876 (1995) ("where the only avenue for relief is the statutorily prescribed administrative and judicial review proceedings" such proceedings constitute "the exclusive remedy"); *Moats v. City of Hagerstown,* 324 Md. 519, 527, 529, 597 A.2d 972, 975–976, 977 (1991) ("[T]he General Assembly has expressly provided that the Law Enforcement Officers' Bill of Rights procedures are an officer's exclusive remedy, at least with regard to alternate procedures under local law. * * * The ... legislative history clearly supports the position that the procedures of the Law Enforcement Officers' Bill of Rights are exclusive"); *Muhl v. Magan, supra,* 313 Md. at 480, 545 A.2d at 1330 (where the plaintiff sought "a form of relief generally unknown to the common law," and the only avenue for such relief was

the administrative "remedy which the General Assembly has created for [such] situations," the remedy is exclusive); *Nordheimer v. Montgomery County,* 307 Md. 85, 96–98, 512 A.2d 379, 386–387 (1986); *Potomac Elec. Power v. P.G. County,* 298 Md. 185, 189–191, 468 A.2d 325, 327–328 (1983); *Apostol v. Anne Arundel County,* 288 Md. 667, 672–673, 421 A.2d 582, 585 (1980), and cases there discussed.[6]

Despite occasional dicta in a few opinions suggesting the contrary, where neither the statutory language nor the legislative history disclose an intent that the administrative remedy is to be exclusive, and where there is an alternative judicial remedy under another statute or under common law or equitable principles, there is no presumption that the administrative remedy was intended to be exclusive.[7] There is in this situation, however, a presumption that the administrative remedy is intended to be primary, and that a claimant cannot maintain the alternative judicial action without first invoking and exhausting the administrative remedy. *See, e.g., Md. Reclamation v. Harford County, supra,* 342 Md. at 493, 677 A.2d at 576 ("this Court has 'ordinarily construed the pertinent [legislative] enactments to require that the adminis-

---

**6.** Where the Legislature creates an administrative remedy, and where there exists no other recognized statutory, common law, or equitable remedy for relief in the matter, the Declaratory Judgment Act itself does not create an alternative remedy. *See,* Code (1974, 1995 Repl.Vol.), § 3–409(b) and (c) of the Courts and Judicial Proceedings Article; *Apostol v. Anne Arundel County,* 288 Md. 667, 672–673, 421 A.2d 582, 585 (1980).

**7.** *But cf. Sec., Dep't of Human Res. v. Wilson,* 286 Md. 639, 643–644, 409 A.2d 713, 716 (1979), where the Court incorrectly stated: "Ordinarily, where a statutory administrative remedy is provided, it will be deemed exclusive." Actually, the statutory administrative and judicial review remedy involved in *Wilson* was properly held to be exclusive, although not because of the above-quoted statement. It was exclusive because the statutory scheme authorizing the administrative and judicial review remedy created the cause of action involved, and there existed no recognized alternative action for the plaintiffs' claims. *See also White v. Prince George's Co.,* 282 Md. 641, 649, 387 A.2d 260, 265 (1978), involving a similar situation. In addition, sometimes opinions in this area seem to use the word "exclusive" when the court actually means "primary."

trative remedy be first invoked and followed' before resort to the Courts"); *Luskin's v. Consumer Protection*, 338 Md. 188, 194–199, 657 A.2d 788, 791–793 (1995); *Clinton v. Board of Education*, 315 Md. 666, 678, 556 A.2d 273, 279 (1989) ("Ordinarily, when there are two forums available, one judicial and the other administrative, . . . and no statutory directive indicating which should be pursued first, a party is often first required to run the administrative remedial course before seeking a judicial solution"); *Quesenberry v. WSSC*, 311 Md. 417, 424, 535 A.2d 481, 484 (1988); *Md.-Nat'l Cap. P. & P. Comm'n v. Crawford, supra*, 307 Md. at 13, 511 A.2d at 1085; *Bd. of Ed. for Dorchester Co. v. Hubbard, supra*, 305 Md. at 786, 506 A.2d at 631 ("we have ordinarily construed the pertinent enactments to require that the administrative remedy be first invoked and followed"); *Prince George's Co. v. Blumberg*, 288 Md. 275, 283–284, 418 A.2d 1155, 1160 (1980), *cert. denied*, 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981).

 Nonetheless, the presumption that the Legislature intended the administrative remedy to be primary is rebuttable, and other factors are pertinent. Thus, even though the legislative enactments may not specifically resolve the issue, it is important to consider any indications of legislative intent reflected in the statutory language, the statutory framework, or the legislative history. *See, e.g., National Asphalt v. Prince George's Co.*, 292 Md. 75, 79, 437 A.2d 651, 653 (1981); *Md.-Nat'l Cap. P. & P. v. Wash. Nat'l Arena, supra*, 282 Md. at 596–597, 386 A.2d at 1223–1224.

 The comprehensiveness of the administrative remedy is a factor to be considered. A very comprehensive administrative remedial scheme is some indication that the Legislature intended the administrative remedy to be primary, whereas a non-comprehensive administrative scheme suggests the contrary. *Compare, e.g., Luskin's v. Consumer Protection, supra*, 338 Md. at 196–197, 657 A.2d at 792; and *Bd. of Ed. for Dorchester Co. v. Hubbard, supra*, 305 Md. at 787–792, 506 A.2d at 631–634; *with Md.-Nat'l Cap. P. & P. Comm'n v.*

*Crawford, supra,* 307 Md. at 25–26, 511 A.2d at 1091–1092. Another factor is the administrative agency's view of its own jurisdiction. Consistent with the principle that an agency's interpretation of the statute which it administers is entitled to weight, we have relied on the agency's interpretation that the remedy before the agency was not intended to be primary. *See, e.g., National Asphalt v. Prince George's Co., supra,* 292 Md. at 80, 437 A.2d at 653–654.

■ An extremely significant consideration under our cases is the nature of the alternative judicial cause of action pursued by the plaintiff. Where that judicial cause of action is wholly or partially dependent upon the statutory scheme which also contains the administrative remedy, or upon the expertise of the administrative agency, the Court has usually held that the administrative remedy was intended to be primary and must first be invoked and exhausted before resort to the courts. For example, in *Quesenberry v. WSSC, supra,* 311 Md. 417, 535 A.2d 481, the plaintiff brought a declaratory judgment and breach of contract action seeking damages for breach of contractual rights under a statutory pension plan. While acknowledging that the rights conferred by the pension plan were contractual and would otherwise support a common law breach of contract action, this Court held that the plaintiff was first required to invoke and exhaust the administrative remedies provided by the statutory pension plan. *See also, e.g., Clinton v. Board of Education, supra,* 315 Md. at 678–679, 556 A.2d at 279; *Bd. of Ed. for Dorchester Co. v. Hubbard, supra,* 305 Md. at 790–792, 506 A.2d at 633–634; *Md. Comm'n on Human Rel. v. Beth. Steel,* 295 Md. 586, 592–594, 457 A.2d 1146, 1149–1150 (1983); *Comm'n on Human Rel. v. Mass Transit,* 294 Md. 225, 233, 449 A.2d 385, 389 (1982).

■ On the other hand, where the alternative judicial remedy is entirely independent of the statutory scheme containing the administrative remedy, and the expertise of the administrative agency is not particularly relevant to the judicial cause of action, the Court has held that the administrative

remedy was not intended to be primary and that the plaintiff could maintain the independent judicial cause of action without first invoking and exhausting the administrative procedures. *See, e.g., Md.-Nat'l Cap. P. & P. Comm'n v. Crawford, supra,* 307 Md. at 25, 511 A.2d at 1091; *Md.-Nat'l Cap. P. & P. v. Wash. Nat'l Arena, supra,* 282 Md. at 598–599, 386 A.2d at 1224.[8]

## B.

■■■ Applying the above-summarized principles to the present case leads to the conclusion that the circuit court erred in holding that the plaintiffs were required to invoke and exhaust their administrative remedies under the Insurance Code. Moreover, it is clear that the Court of Special Appeals erred in *Vicente v. Prudential Ins. Co. of America, supra,* 105 Md.App. 13, 658 A.2d 1106, and that case is overruled.

Neither the Unfair Trade Practices subtitle nor the general remedial provisions of the Insurance Code contain any language indicating that the administrative remedies there pro-

---

**8.** A case illustrating each of the above-described situations is *Leatherbury v. Gaylord Fuel Corp.* 276 Md. 367, 347 A.2d 826 (1975). The plaintiffs in that case owned and lived on a farm adjacent to the property on which the defendants intended to operate a limestone quarry. The defendants applied for and received a permit from the Maryland Department of Health and Mental Hygiene to install limestone crushing and air pollution control equipment in order to operate the quarry. The plaintiffs could have challenged the granting of the permit by appealing to the Board of Review of the Department of Health and Mental Hygiene and seeking judicial review of any adverse decision by the Board; they failed, however, to do so. Thereafter, the plaintiffs filed two actions in the circuit court. In one action, they challenged the issuance of the administrative permit on the grounds that procedural requirements were violated and that federal and state air quality control regulations would be violated. In the other action, the plaintiffs claimed that the operation of the quarry would constitute a common law nuisance. In the action challenging the permit, this Court affirmed a judgment adverse to the plaintiffs on the ground that they had failed to invoke and exhaust their administrative remedy. In the nuisance action, however, this Court affirmed on the merits a judgment in favor of the defendant, relying on traditional nuisance case-law.

vided for are exclusive. Furthermore, unlike *Bowman v. Goad, supra,* 348 Md. at 202, 703 A.2d at 145; *Muhl v. Magan, supra,* 313 Md. at 480, 545 A.2d at 1330; and *Apostol v. Anne Arundel County, supra,* 288 Md. at 672–673, 421 A.2d at 585, the cause of action provided by the Insurance Code was not the only recognizable cause of action encompassing the plaintiffs' claims. Instead, under the allegations of the second amended complaint, the plaintiffs set forth recognized common law causes of action sounding in deceit and negligence.

Although there is a legal presumption that a statutory administrative and judicial review remedy is intended to be primary, that presumption is rebutted under the circumstances here. The plaintiffs' asserted causes of action in deceit and negligence are wholly independent of the Insurance Code's Unfair Trade Practices subtitle. No interpretations or applications of the Insurance Code or of any regulations by the Insurance Commissioner are involved. Instead, under the plaintiff's allegations and theory of the case, their right to recover money damages is totally dependent upon the common law tort principles applicable to deceit and negligence actions. Moreover, the expertise of the Insurance Commissioner would appear to be irrelevant to these common law causes of action.

Although the regulatory and remedial provisions of the Unfair Trade Practices subtitle of the Insurance Code are somewhat comprehensive, no prior decision by this Court has viewed those provisions as sufficiently all-encompassing so as to preclude resort to a fully independent common law remedy without first invoking and exhausting the administrative remedy under the Insurance Code. *Cf. Equitable Life v. State Comm'n,* 290 Md. 333, 337–339, 430 A.2d 60, 63–64 (1981) (rejecting an insurer's argument that the regulatory provisions of the Insurance Code are so extensive that they indicate a legislative intent to preclude concurrent jurisdiction by the Commission on Human Relations over alleged unfair discriminatory practices in the sale of insurance). Furthermore, as previously noted, the Insurance Commissioner has not viewed

the administrative remedy under the Unfair Trade Practices subtitle to be primary.

While there are no applicable provisions of the Unfair Trade Practices subtitle which expressly state that a claimant is entitled to pursue an alternative judicial remedy without invoking and exhausting the administrative remedy, nevertheless the statutory language does suggest that the administrative remedy is not to be primary. As discussed in Part I of this opinion, the general administrative remedy for violations of the Unfair Trade Practices subtitle is contained in Art. 48A, § 215. This remedy may culminate in the issuance of a cease and desist order by the Insurance Commissioner which is the subject to judicial review. Subsection (d) of § 215 then provides as follows:

"No order of the Commissioner pursuant to this section or order of court to enforce it shall in any way relieve or absolve any person affected by such order from any other liability, penalty, or forfeiture under law."

By stating that an administrative order under the Unfair Trade Practices subtitle shall not "in any way relieve" any person "from any other liability ... under law," the General Assembly has clearly stated that the administrative remedy is not exclusive. In addition, this language certainly suggests that the administrative remedy is not primary, and that other remedies under law are fully concurrent.

In sum, we conclude that the General Assembly did not intend, under circumstances like those in the instant case, to preclude claimants from pursuing a recognized independent tort remedy without first invoking and exhausting the administrative remedy under the Unfair Trade Practices subtitle of the Insurance Code.

### V.

Finally, we agree with the plaintiffs that the circuit court erroneously dismissed Counts V and VI of the second amended complaint on the ground that limitations had run. The factual allegations underlying counts V and VI were all

contained in the initial complaint filed by Zappone. Counts V and VI of the second amended complaint merely substituted Print–A–Copy for Zappone as the proper plaintiff with regard to those allegations. The operative facts forming the basis of Print–A–Copy's claims remained essentially the same as set forth in the initial complaint. Thus, counts V and VI of the second amended complaint related back to the date when the initial complaint was filed.

In *Crowe v. Houseworth*, 272 Md. 481, 325 A.2d 592 (1974), this Court addressed the issue of whether the relation back doctrine was applicable to an amendment adding additional plaintiffs to a common law trespass action. In *Crowe*, the plaintiff, one of eleven owners of a parcel of land as joint tenants, brought an action against the defendant for entering and removing timber from part of the land. The defendant moved to dismiss the action, arguing that it was improper because the plaintiff had failed to join all of the other joint tenants of the land as plaintiffs. Following the expiration of the statute of limitations, the plaintiff proffered an amendment to his initial complaint joining the other ten joint tenants as plaintiffs. The trial court refused to allow the amendment and granted the defendant's motion to dismiss. In reversing the trial court, this Court stated as follows (272 Md. at 485–486, 325 A.2d at 595):

> "A frequently encountered problem, which is the result of the more liberal use of amendments, is whether a new action has commenced, an action which may be barred by limitations, or whether the doctrine of relation back is applicable: that is, whether the assertion of the original complaint tolled the running of the statute. The modern view seems to be that so long as the operative factual situation remains essentially the same, no new cause of action is stated by a declaration framed on a new theory or invoking different legal principles. As a consequence, the doctrine of relation back is applied, and the intervention of a plea of limitations [is] prevented."

The Court in *Crowe* noted that it had liberally applied the relation back doctrine in other contexts, always emphasizing

whether a proposed amendment, if allowed, would substantially prejudice a defendant by submitting that defendant to unfair surprise, hardship, or an undue burden in defending the plaintiff's amended allegations. 272 Md. at 487–488, 325 A.2d at 596–597. The Court concluded that " 'when a defendant has had notice from the beginning that the plaintiff sets up and is trying to enforce a claim against it because of specified conduct, the reasons for the statute of limitations do not exist, and we are of the opinion that a liberal rule should be applied.' " 272 Md. at 489, 325 A.2d at 597, quoting *New York Central & H.R. R. Co. v. Kinney,* 260 U.S. 340, 346, 43 S.Ct. 122, 123, 67 L.Ed. 294, 296 (1922). *See also Greentree v. Fertitta,* 338 Md. 621, 625 n. 5, 659 A.2d 1325, 1327 n. 5 (1995); *Ott v. Kaiser–Georgetown Health Plan,* 309 Md. 641, 653, 526 A.2d 46, 52 (1987); *Cherry v. Brothers,* 306 Md. 84, 92, 507 A.2d 613, 617 (1986); *McSwain v. TriState Transportation,* 301 Md. 363, 370, 483 A.2d 43, 46–47 (1984); *Ehrlich v. Board of Education,* 257 Md. 542, 547–550, 263 A.2d 853, 856–857 (1970).

In the case at bar, the defendants were on notice from the beginning of the lawsuit that one of the asserted grounds for recovery was based upon the defendant Miller's allegedly fraudulent or negligent misrepresentations with respect to the deductibility of loan interest payments. Counts V and VI, rather than asserting new causes of action against the defendants, simply refined and clarified the allegations of the initial complaint by more precisely stating the proper plaintiff who was injured by the defendants' allegedly fraudulent and/or negligent conduct. The defendants were fully aware of the relationship between Zappone and Print–A–Copy, namely that Zappone was Print–A–Copy's sole shareholder and was otherwise involved in all phases of its business operations. The insurance policy's premium payments were paid by checks drawn on Print–A–Copy's account. The defendants knew prior to the initiation of the instant suit that Print–A–Copy had obtained a bank loan for the specific purpose of financing the payment of Zappone's life insurance premium and was, therefore, the party that would suffer any adverse tax conse-

quences as a result of the allegedly false information and advice communicated to Zappone by Miller. Nevertheless, the defendants did not file a motion to dismiss for failure to join a necessary party with respect to the initial complaint's allegations involving the representations allegedly made concerning the tax deductibility of the loan interest payments. The defendants were neither prejudiced nor surprised by the addition of Print–A–Copy as a party and by the addition of Counts V and VI on its behalf.

Under the principles set forth in the above-cited cases, the second amended complaint related back to the date the initial complaint was filed, and the circuit court erred in dismissing counts V and VI on the ground of limitations.

*JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY REVERSED, AND CASE REMAND-ED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE RESPONDENTS.*