763 A.2d 1196

### INTERCOM SYSTEMS CORPORATION

v.

### BELL ATLANTIC OF MARYLAND, INC.

**No. 154, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Dec. 22, 2000.

Constance A. Camus, Greenbelt, for appellant.

Karen M. Hardwick (Rose Marie L. Audette and Hogan & Hartson L.L.P. on the brief), Washington, DC, and Baltimore, for appellee.

Argued before SONNER, KRAUSER, and MARVIN H. SMITH (Retired, specially assigned), JJ.

KRAUSER, Judge.

This is an appeal from an order of the Circuit Court for Prince George's County, dismissing a complaint filed by appellant, Intercom Systems Corporation, against appellee, Bell Atlantic of Maryland, Inc. ("Bell Atlantic"), for tortious inter-

ference with contract or economic relations,[1] negligence, and breach of contract. That dismissal, the circuit court declared, was compelled by this Court's holding in *Bits "N" Bytes v. C & P Telephone,* 97 Md.App. 557, 631 A.2d 485 (1993), that the Public Service Commission Act ("Act"), now the Public Utility Companies Article (PUC)of the Maryland Code,[2] provides an exclusive remedy for such claims before the Public Service Commission ("Commission" or "PSC"). The circuit court's reliance on that case was appropriate and the result it reached, under that decision, correct.

Nonetheless, in light of the decision of the Court of Appeals in *Zappone v. Liberty Life,* 349 Md. 45, 706 A.2d 1060 (1998), we now conclude that the remedy provided by that Act is primary and not exclusive. Accordingly, we shall reverse the judgement of the circuit court and, to the extent that our decision in *Bits "N" Bytes* is inconsistent with this opinion, we overrule that decision.

### Background

Appellant, Intercom Systems Corporation, was an internet service provider that conducted business in Clinton, Maryland. As an internet service provider, appellant was entirely dependent on local phone access service to conduct its business. That service was provided by Bell Atlantic, the local exchange carrier for the Clinton area. Among other things, appellant relied on Bell Atlantic to provide it with regular telephone service, Centrex lines, a 56K data link, and high speed circuits such as frame relay and T–1 circuits.

---

1. In its brief, appellant states that "Count 1" of its complaint is incorrectly titled "Interference with Contract Relations," when it should have read, "Interference with Economic Relations." This error does not defeat its claim, appellant asserts, because, regardless of how it is captioned, that count alleges the elements that constitute such a claim. To avoid confusion, however, we have combined the two designations and refer to that count in this opinion as "Interference with economic or contract relations."

2. Md.Code Ann., (1998), Pub.Util.Cos.Art., §§ 1–101 to 13–207.

Growing increasingly dissatisfied with the quality of the services provided by Bell Atlantic and unhappy with the seeming unwillingness of Bell Atlantic to provide other services requested, appellant began filing complaints with the Public Service Commission. The Commission is "an independent unit in the Executive Branch of State Government." PUC § 2–101. Its function is to "supervise and regulate the public service companies," PUC § 2–113, such as Bell Atlantic, pursuant to the Public Utility Companies Act.

On February 16, 1995, appellant, then Intercom Micro Systems, lodged seven informal complaints against Bell Atlantic in a letter to Frank Fulton, Director of the Consumer Assistance and Public Affairs Office of the Commission. In that letter, appellant principally claimed that Bell Atlantic: 1) provided telephone lines that repeatedly malfunctioned, thereby interrupting appellant's service to its customers; 2) rerouted appellant's telephone voice line to one of its competitors; and 3) refused to provide certain services ordered by appellant, such as "remote access telephone numbers," [3] despite providing the same services to appellant's competitors.

In response to these complaints, Fulton conducted an informal investigation. At the conclusion of that investigation, in a letter to appellant, dated August 31, 1995, Fulton stated that he had held two conferences with the parties, and that in response Bell Atlantic had agreed to "construct and install the hardware needed to expand [appellant's] system." He further stated that the investigation was now complete and that it appeared that "these last efforts [by Bell Atlantic] would resolve the problem." He then concluded that letter by informing appellant that it could appeal his findings by "filing a Formal Complaint with the Public Service Commission pursuant to Code of Maryland Regulations (COMAR) 20.32.01.04M. and 20.07.03.04." Instead, appellant sent a letter to Fulton, dated September 28, 1995, stating that "[t]he

---

**3.** Such telephone numbers would provide appellant's customers, who are outside the local dialing district, with a local number for calling appellant.

Public Service Commission has fulfilled every fair aspect of this complaint."

Nonetheless, appellant's problems with Bell Atlantic persisted. From January 7, 1997, through February 24, 1997, appellant submitted to the Commission nine "filings" which consisted of sixteen different complaints against Bell Atlantic. In those complaints, appellant alleged, among other things, that Bell Atlantic: 1) had refused to provide new telephone service; 2) had maliciously disrupted appellant's telephone service; 3) had refused to repair broken facilities for appellant; 4) had over-billed and incorrectly billed appellant for services rendered; 5) had refused to list appellant in both the 411 Information Directory and the Business White Pages directory; and 6) had given preferential treatment to appellant's competitors. According to appellant, Bell Atlantic's conduct constituted an "intentional and improper interference with the business expectations of appellant and its customers," and was part of a deliberate attempt to put appellant, a competitor of a subsidiary of Bell Atlantic's, out of business.

A second informal investigation by Fulton ensued. It culminated in the issuance of a final letter by Fulton, dated April 11, 1997, reviewing each of appellant's allegations. Among other things, that letter indicated that on four occasions Bell Atlantic had agreed that it had overbilled or issued incorrect bills to appellant and, as a result, it had applied the following credits to appellant's accounts: $1,477.33, $1,709.11, $408.00, and $1,754.34. Notwithstanding these discrepancies, Fulton concluded his letter with a statement that he did "NOT believe that [Bell Atlantic had] failed to act in good faith with the customer" and that it "ha[d] NOT violated any of its Commission-approved tariffs" (emphasis in original). He then informed appellant once again that it could appeal his findings by filing a formal complaint with the Commission.

Five days later, on April 16, 1997, appellant filed a lawsuit against Bell Atlantic in the Circuit Court for Prince George's County, alleging tortious interference with contract relations,

negligence, and breach of contract.[4] The dismissal of that complaint lies at the core of this appeal.

Nine days after that, on April 25, 1997, appellant filed a formal complaint with the Commission and re-submitted the sixteen complaints it had previously filed. Appellant's case was assigned to a hearing examiner, pursuant to PUC § 3–104.[5] While the formal investigation was pending, appellant added a seventeenth complaint, alleging that Bell Atlantic's conduct was designed to benefit "Bell Atlantic Internet Solutions, Inc," a subsidiary of Bell Atlantic that, like appellant, is in the business of providing internet service to the public.

In this latest complaint, appellant requested compensatory and punitive damages for Bell Atlantic's "deliberate and malicious" conduct. After discovery was concluded, Bell Atlantic filed a "Motion for Summary Dismissal." On December 23, 1999, the hearing examiner issued a twenty-four page proposed order, granting Bell Atlantic's motion. In that order, the examiner summarized Bell Atlantic's position as follows:

Bell Atlantic claims that in all of the complaints, it has undertaken corrective action. Thus, where a complaint was made as to an over-billing, credit has been granted; where a

---

4. At the hearing on Bell Atlantic's motion to dismiss this complaint, appellant's counsel stated that the complaint was filed before administrative remedies were exhausted because he was concerned about the statute of limitations.

5. Section 3–104 provides, in part:
(b) Conduct of proceedings.—(1) The Commission, a commissioner, or a hearing examiner may conduct hearings, examine witnesses, administer oaths, and perform any other acts necessary to the conduct of proceedings.
. . .
(d) Delegation.—(1) The Commission may delegate to a commissioner or to a hearing examiner the authority to conduct a proceeding that is within the Commission's jurisdiction.
(2) In a delegated proceeding, the commissioner or hearing examiner shall:
(i) conduct the hearing and any other proceeding that the commissioner or hearing examiner considers necessary; and
(ii) file with the Commission, and simultaneously serve on all parties, a proposed order and findings of fact.

complaint was made that services were not provided, those services have now been provided; and when a complaint was made that actions were impacting negatively on a client of [appellant], those actions have ceased.

The hearing examiner then concluded, "In reviewing all [of appellant's] complaints, it is clear that [Bell Atlantic] has responded to each complaint, and any action taken has properly resolved the complaint ... [and] there is no further action that needs to be taken by [Bell Atlantic], consistent with the tariffs, to satisfy any [of appellant's] complaints."

Before dismissing appellant's complaints, however, the hearing examiner noted that "[t]he crux of what [appellant] claims should be remedied involves an alleged pattern, ongoing scheme, or willful course of conduct by [Bell Atlantic] designed to destroy the business of [appellant]." It is "entirely understandable," the examiner surmised, that appellant drew this conclusion based on Bell Atlantic's conduct. He observed that Bell Atlantic is a "sophisticated company with technological and management systems in place to provide reliable service to its customers" and that the "cumulative affect [sic] of the actions described in [appellant's] complaints certainly belie the standard of reliability expected of Bell Atlantic." He concluded, "[i]t is, indeed, very troublesome that this succession of problems has occurred. Moreover, it is reasonably foreseeable that the repeated problems could and probably did have serious economic consequences [for appellant]."

Observing, however, that appellant's "claim for economic damage seeks to obtain a remedy that is beyond the boundary of the tariffs or the Commission's statutory authority," the examiner granted Bell Atlantic's motion for summary dismissal. That order became final on January 25, 2000. Thereafter, appellant filed a petition for judicial review in the Circuit Court for Prince George's County. That petition is still pending.

As noted earlier, the complaint filed by appellant in the circuit court consisted of three counts: tortious interference with economic or contract relations, negligence, and breach of

contract. In support of its claim of tortious interference with economic or contract relations, appellant alleged that Bell Atlantic, "either directly or through a subsidiary, is a direct competitor of [appellant] in providing Internet access to the general public." Because it is a competitor of appellant, it has, according to appellant, intentionally 1) failed to promptly provide new or additional circuits, 2) provided circuits that repeatedly failed, or were of low quality, 3) incorrectly billed or otherwise charged appellant higher prices than appellant's competitors, 4) failed to provide appellant with circuits, while promptly providing circuits for appellant's competitors, 5) rerouted or forwarded appellant's voice lines to competitors, and 6) refused to list appellant in the White Pages or in its 411 Information Directory listings. Furthermore, appellant alleged that Bell Atlantic's actions were intended to harm appellant and "done with evil motive, ill will." Consequently, it demanded compensatory and punitive damages.

On May 23, 1997, Bell Atlantic filed a motion to dismiss appellant's complaint for failure to state a claim upon which relief can be granted. In support of that motion, Bell Atlantic asserted that appellant had filed complaints with the PSC alleging the same conduct complained of in its lawsuit and that, "[t]herefore, under the doctrine of exhaustion of administrative remedies, [appellant] may only seek judicial review, if at all, from a final decision of the agency." In response, appellant asserted that its claims were "independent of any PSC regulation" and that "the PSC cannot provide, to any substantial degree, a remedy." For those reasons, appellant maintained that it should be permitted to proceed with its cause of action.

On November 14, 1997, at the hearing on Bell Atlantic's motion to dismiss, appellant argued that Bell Atlantic had intentionally violated administrative rules and tariffs in an effort to destroy appellant. It conceded, however, that the PSC's formal investigation should be permitted to proceed to a conclusion. It therefore requested that the circuit court stay its lawsuit pending the outcome of the on-going administrative proceedings, rather than dismiss it.

After hearing argument, the circuit court stated that it was "constrained by the decision contained in *Bits "N" Bytes* ... [to find] that the allegations raised in the complaint are within the exclusive jurisdiction of the Public Service Commission" and, on that basis, dismissed the complaint. Appellant now appeals that dismissal.

### Discussion

The issue before us is whether the administrative remedy provided by the PUC Article before the Commission is exclusive, primary, or concurrent. If primary or concurrent, as appellant contends, the circuit court erred in dismissing appellant's complaint. Because we find that the remedy in question is primary, appellant's request that the proceedings before that court be stayed (and not dismissed) pending appellant's exhaustion of the Commission's administrative remedy, should have been granted.

Before proceeding with an analysis of the issues before us, however, we note that the circuit court and the parties addressed the question of exhaustion of administrative remedies in terms of whether the Commission has exclusive, primary, or concurrent "jurisdiction" over appellant's claims. The use of the term "jurisdiction" is misleading. We are dealing here not with "a limitation upon the subject matter jurisdiction" but with the nature of the available administrative remedy. *Maryland–Nat'l Cap. P & P Comm'n v. Crawford*, 307 Md. 1, 13 n. 4, 511 A.2d 1079 (1986). As we have previously observed, "[A] court is usually not without subject matter jurisdiction to consider an original civil suit brought by a party who has failed to exhaust his exclusive administrative remedies." *Bits "N" Bytes*, 97 Md.App. at 567, 631 A.2d 485. Admittedly, however, the exhaustion doctrine "is for some purposes treated like a jurisdictional issue." *Crawford*, 307 Md. at 13–14, n. 4, 511 A.2d 1079. Moreover, if properly invoked, it may require the trial court to dismiss or stay the action before it. Nonetheless, it should be reemphasized that the terms "exclusive," "primary," and "concurrent" apply only to the administrative remedy available to the claimant and do

not impose any limitation on the subject matter jurisdiction of the courts.

## I

The exhaustion of remedies doctrine requires that "one must exhaust statutorily prescribed administrative remedies before resorting to the courts." *Maryland Comm'n on Human Rel. v. Downey Communications, Inc.*, 110 Md.App. 493, 526, 678 A.2d 55 (1996); *see also McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989). In other words, "ordinarily a party must pursue the prescribed administrative procedure to its conclusion and await its final outcome . . . [and] a party can resort to a court only when there is a final order in the administrative proceeding." *Maryland Comm'n on Human Rel. v. Baltimore Gas and Electric Co.*, 296 Md. 46, 51, 459 A.2d 205 (1983).

The rationale underlying the doctrine is:

The decisions of an administrative agency are often of a discretionary nature, and frequently require an expertise which the agency can bring to bear in sifting the information presented to it. The agency should be afforded the initial opportunity to exercise that discretion and to apply that expertise. Furthermore, to permit interruption for purposes of judicial intervention at various stages of the administrative process might well undermine the very efficiency which the Legislature intended to achieve in the first instance. Lastly, the courts might be called upon to decide issues which perhaps would never arise if the prescribed administrative remedies were followed.

*Soley v. State Comm'n on Human Rel.*, 277 Md. 521, 526, 356 A.2d 254 (1976).

## II

In Maryland, the Legislature has "created [a] comprehensive and detailed administrative machinery for the regulation of public utilities throughout the State." *Spintman v. C & P Telephone*, 254 Md. 423, 427, 255 A.2d 304 (1969). That

administrative machinery is set forth in §§ 1–101 to 13–207 of the PUC Article of the Maryland Code.[6]  Pursuant to that Act, the Commission is expressly authorized to supervise and regulate all public utility companies in Maryland.  PUC § 2–113[7]  For that purpose, it is granted "the implied and incidental powers needed or proper to carry out its functions under this article."  PUC § 2–112[8]

As to the handling of complaints against public utility companies, the Commission is authorized to receive a complaint from any person, PUC § 3–102(a), or it may proceed on its own motion, PUC § 3–102(e), to conduct an investigation, PUC § 2–115.  In furtherance of that investigation, it may

---

**6.**  Prior to 1998, the Public Utility Companies Article was codified at Article 78 of the Maryland Code Annotated.

**7.**  Section 2–113, Supervisory and regulatory power, provides:
(a) In general.—(1)  The Commission shall:
(i) supervise and regulate the public service companies subject to the jurisdiction of the Commission to:
1.  ensure their operation in the interest of the public;  and
2.  promote adequate, economical, and efficient delivery of utility services in the State without unjust discrimination;  and
(ii) enforce compliance with the requirements of law by public service companies, including requirements with respect to financial condition, capitalization, franchises, plant, manner of operation, rates and service.
(2) In supervising and regulating public service companies, the Commission shall consider the public safety, the economy of the State, the conservation of natural resources, and the preservation of environmental quality.
(b) Construction.—The powers and duties listed in this title do not limit the scope of the general powers and duties of the Commission provided for by this article.

**8.**  Section 2–112, Jurisdiction;  general powers, provides:
(a) Jurisdiction.—To the full extent that the Constitution and laws of the United States allow, the Commission has jurisdiction over each public service company that engages in or operates a utility business in the State and over motor carrier companies as provided in Title 9 of this article.
(b) General powers.—(1)  The Commission as the power specifically conferred by law.
(2) The Commission has the implied and incidental powers needed or proper to carry out its functions under this article.
(c) Liberal construction.—The powers of the Commission shall be construed liberally.

serve process, PUC § 3–103, conduct hearings, PUC § 3–104, and issue subpoenas to compel testimony or the production of documents. PUC § 3–109. After the Commission has issued a decision or order, any party, dissatisfied with the result reached by the Commission, may petition the circuit court for judicial review of that decision or order.

The scope of that review is as follows:

Every final decision, order, or regulation of the Commission is prima facie correct and shall be affirmed unless clearly shown to be:

(1) unconstitutional;

(2) outside the statutory authority or jurisdiction of the Commission;

(3) made on unlawful procedure;

(4) arbitrary or capricious;

(5) affected by other error of law, or

(6) if the subject of review is an order entered in a contested proceeding after a hearing, the order is unsupported by substantial evidence on the record considered as a whole.

PUC § 3–203.

Thus, the Act creates a comprehensive but, as we shall see, not an exclusive system for the resolution of complaints against the public utility companies.

### III

The circuit court dismissed appellant's complaint on the ground that the Commission had exclusive "jurisdiction" over the claims raised in that complaint. In so ruling, the circuit court relied exclusively on our decision in *Bits "N" Bytes*. The facts of that case are as follows. Bits "N" Bytes" ("BNB"), a supplier of computers and computer parts, had entered into a series of directory advertising contracts with the Chesapeake & Potomac and Telephone Co. of Maryland ("C & P"). *Id.* at 561, 631 A.2d 485. When BNB failed to pay money owed C & P pursuant to those contracts, C & P cut off

its telephone service and filed suit against BNB in the District Court of Maryland to collect that money. *Id.* at 562, 631 A.2d 485. Upon BNB's request for a jury trial, the case was removed to the circuit court where BNB filed a counterclaim. *Id.* at 561–62, 631 A.2d 485. In that counterclaim, BNB made the following allegations:

> BNB ... asserted that C & P falsely advised BNB that C & P had a right to interrupt BNB's telephone service if BNB failed to pay its directory advertising bill, which led BNB to terminate its Baltimore area telephone service. Additionally, BNB asserted that C & P's "illegal threats and false claims" constituted a breach of its directory advertising contracts with BNB and caused BNB to suffer "a substantial loss of profits, as well as other incidental and consequential damages." BNB asked that its directory advertising contract with C & P be rescinded (Count I), or alternatively that BNB be awarded "consequential damages of $20,000" and "incidental damages of $5,000 and costs" sustained because of C & P's breach of the contracts (Count II). Finally, BNB asserted that C & P's "threat to interrupt service and actual interruption" of BNB's service "constituted intentional interference with [BNB's] business relations and prospective advantage" because, as C & P "well knew," BNB's business "was primarily conducted on the telephone"; on this count (Count III) BNB claimed "consequential damages of $20,000, incidental damages of $5,000 and punitive damages of $1,000,000 and costs."

*Id.* at 562, 631 A.2d 485.

Ultimately, the circuit court dismissed and later refused to reinstate BNB's complaint because of its failure to exhaust administrative remedies. *Id.* at 565, 631 A.2d 485 BNB appealed that decision.

Relying on a line of cases holding that, if a specific statutory remedy is provided with limited judicial review, that statutory remedy is exclusive, *Sec., Dep't of Human Res. v. Wilson,* 286 Md. 639, 409 A.2d 713 (1979); *White v. Prince George's County,* 282 Md. 641, 387 A.2d 260 (1978); *Maryland—Nat'l*

*Cap. Park & Planning Comm'n v. Wash. Nat'l Arena,* 282 Md. 588, 386 A.2d 1216 (1978); *Soley v. St. Comm'n on Human Rel., supra,* this Court affirmed the judgment of the circuit court, dismissing BNB's counterclaim, on the ground "that the Public Service Commission Act provides the exclusive remedy for determination of BNB's claims that C & P violated a PSC regulation." *Id.* at 582, 631 A.2d 485. That decision was rendered before the Court of Appeals decided *Zappone v. Liberty Life Ins. Co.,* 349 Md. 45, 706 A.2d 1060 (1998). The circuit court, as appellant noted in its brief, "did not have the advantage of the *Zappone* roadmap" when it rendered its decision. Fortunately, we do.

In *Zappone,* the Court of Appeals stated that "there is a legal presumption that a statutory administrative and judicial review remedy is intended to be primary," not exclusive, and thereby held that the line of cases relied upon by this Court in reaching a contrary conclusion in *Bits "N" Bytes* is no longer controlling. *Id.,* 349 Md. at 67, 706 A.2d 1060. Further, the Court of Appeals stated in Zappone that it was simply incorrect when the Court asserted in *Sec., Dep't of Human Res. v. Wilson, supra* that "[o]rdinarily, where a statutory administrative remedy is provided, it would be deemed exclusive." *Id.* at 63, n. 7, 706 A.2d 1060. The facts of *Zappone* are as follows.

Zappone, a 62–year–old businessman, was induced by the fraudulent misrepresentations of a licensed general agent of Liberty Life Insurance Company to purchase a large life insurance policy. *Id.* at 52–56, 706 A.2d 1060. Upon discovering that he had been duped, Zappone filed a complaint in the Circuit Court for Montgomery County against the agent, Liberty Life, and First Financial, the licensed managing general agency, for fraud, negligent misrepresentation, and negligence. *Id.* at 56, 706 A.2d 1060. After dismissing one count and granting summary judgment in favor of the defendants on two other counts, the circuit court granted the defendants' motion to dismiss the remaining counts of the complaint because "the remedial provisions of the Insurance Code constituted the exclusive remedy for all claims of unfair or

deceptive trade practices by insurers or insurance agents in connection with the sale of insurance." *Id.* at 57, 706 A.2d 1060. On appeal, the Court of Appeals reversed the judgment of the circuit court on the ground that the statutory remedy provided by the Insurance Code was neither exclusive nor primary but concurrent with any judicial remedy that Zappone had. *Id.*

The Court began its analysis of Zappone's claims by explaining that "[w]henever the Legislature provides an administrative and judicial review remedy for a particular matter or matters, the relationship between that administrative remedy and a possible alternative judicial remedy will ordinary fall into one of three categories." 349 Md. at 60, 706 A.2d 1060. The administrative remedy may be exclusive, primary, or concurrent. *Id.* at 60–61, 706 A.2d 1060.

██ If the administrative remedy is exclusive then the complainant is precluded from filing an independent action in the courts, even after exhausting administrative remedies. *Id.* at 60, 706 A.2d 1060. In *Zappone*, the Court of Appeals stated that an administrative remedy is not presumptively exclusive. "[W]here neither the statutory language nor the legislative history disclose an intent that the administrative remedy is to be exclusive, and where there is an alternative judicial remedy under another statute or under common law or equitable principles, there is no presumption that the administrative remedy was intended to be exclusive." *Id.* at 63, 706 A.2d 1060.

██ If an administrative remedy is primary and not exclusive, the complainant may seek redress by filing an independent judicial action. *Id.* at 60, 706 A.2d 1060. The complainant must first, however, "invoke and exhaust the administrative remedy, and seek judicial review of an adverse administrative decision, before a court can properly adjudicate the merits of the alternative judicial remedy." *Id.* Moreover, in the absence of statutory or legislative history to the contrary, the Court stated that there is "a presumption that the administrative remedy is intended to be primary, and that a

claimant cannot maintain the alternative judicial action without first invoking and exhausting the administrative remedy." *Id.* at 63, 706 A.2d 1060. In determining whether that presumption has been rebutted, the Court directs us to consider the following factors: 1) "[t]he comprehensiveness of the administrative remedy;" 2) "the administrative agency's view of its own jurisdiction;" and 3) "the nature of the alternative judicial cause of action pursued by the plaintiff," that is, whether the "action is wholly or partially dependent upon the statutory scheme which also contains the administrative remedy, or upon the expertise of the administrative agency." *Id.* at 64–65, 706 A.2d 1060.

■ Finally, if the administrative remedy and the judicial remedy are concurrent, "the plaintiff at his or her option may pursue the judicial remedy without the necessity of invoking and exhausting the administrative remedy." *Id.* at 61, 706 A.2d 1060. In determining whether the administrative remedy is concurrent and not primary, the court observed that it has held an administrative remedy to be concurrent "where the alternative judicial remedy is entirely independent of the statutory scheme containing the administrative remedy, and the expertise of the administrative agency is not particularly relevant to the judicial cause of action." *Id.* at 65, 706 A.2d 1060.

## IV

We now turn to the question of whether the administrative remedy in question is exclusive. As previously noted, the Court of Appeals stated in *Zappone,* "[O]rdinarily a statutory administrative and judicial review remedy will be treated as exclusive only when the Legislature has indicated that the administrative remedy is exclusive or when there exists no other recognized alternative statutory, common-law or equitable cause of action." *Id.* at 62, 706 A.2d 1060. In other words, the mere existence of such a remedy does not, as has been suggested in other opinions of this court, establish its

exclusivity unless one or both of the aforesaid conditions are met.

Unlike some other Maryland statutes, the Act contains no language stating that the administrative and judicial review remedy contained therein is exclusive. *See e.g.* Md.Code Ann., (1957, 1996 Repl.Vol., 1999 Supp.), Article 25A, § 5(U) and Article 27, §§ 727—734D. Nor is there any indication in the legislative history of that statute that the remedy was to be so construed. Furthermore, in this case, there is "an alternative judicial remedy" under common law principles, namely, the three causes of actions set forth in appellant's complaint: tortious interference with economic or contract relations, breach of contract, and negligence.

Finally, we add that it is highly unlikely that the Legislature, in creating the administrative remedy in question to address regulatory problems and common consumer complaints before the Commission, intended to shield the public utility companies and their subsidiaries from lawful competition. But that's precisely what would occur if we found the PSC remedy to be exclusive. To so rule would, in effect, leave their competitors, big and small, without any means of seeking economic redress even when, as allegedly occurred here, they have been economically damaged, or in some cases even driven out of business, by the practices of a public utility company. Indeed, the Commission found this aspect of appellant's complaint deeply troubling. In its final order, the Commission asserted that, given Bell Atlantic's conduct, appellant's belief that Bell Atlantic was engaged in an "ongoing scheme, or willful course of conduct ... designed to destroy [appellant's] business" was "entirely understandable." It also expressed skepticism concerning Bell Atlantic's claim that it had not intentionally sought to damage appellant, observing that Bell Atlantic is a "sophisticated company with technological and management systems in place to provide reliable service to its customers" and that the "cumulative effect of the actions described in [appellant's] complaints certainly belie the standard of reliability expected of Bell Atlantic." The Commission further stated, "it is, indeed, very troublesome that

the succession of problems has occurred." Acknowledging that "it is reasonably foreseeable that the repeated problems could and probably did have serious economic consequences [for appellant]," the Commission reluctantly concluded that it lacked "the statutory authority" to order the economic redress requested by appellant and therefore dismissed that claim along with others that Bell Atlantic had apparently rectified. In sum, neither statutory language nor legislative history nor sound public policy supports a finding by this Court that the PSC administrative remedy is or should be exclusive.

The next question for our consideration is whether the administrative remedy provided by the Commission is primary or concurrent. As noted earlier, "there is a legal presumption that a statutory administrative and judicial review remedy is intended to be primary." *Id.* at 67, 706 A.2d 1060. We must therefore presume that the Commission's administrative remedy is primary and apply the *Zappone* factors to determine the validity of that presumption. As previously stated, the first factor to be considered is the comprehensiveness of the administrative remedy. "A very comprehensive administrative remedial scheme is some indication that the Legislature intended the administrative remedy to be primary, whereas a non-comprehensive administrative scheme suggests the contrary." *Id.* at 64, 706 A.2d 1060. Indisputably, the Public Service Commission Act created "a very comprehensive administrative remedial scheme." *Id.* In *Bits "N" Bytes*, this Court outlined the inclusive nature of that remedial scheme:

> [T]he PSC is specifically empowered to make and enforce regulations "necessary to carry out the provisions of the [Act]," including "standards of safe, adequate, reasonable, and proper service." [PUC § 2–112 and 5–101] The PSC is to receive all complaints alleging a violation of the Act (including the regulations promulgated pursuant to it) and "take final action" directing "full or partial satisfaction" or "such action as may be warranted." [PUC § 3–102]. "In any contested case begun by complaint, filed by any person or by the Commission, the person complained of shall be

entitled to a hearing," [PUC § 3–102]; any party to a proceeding has the "right to summon witnesses, present evidence," cross examine witnesses, take depositions etc. [PUC § 3–102] "Any party or any person in interest" dissatisfied with a final PSC decision is entitled to judicial review of that decision. [PUC § 3–202].

97 Md.App. at 568, 631 A.2d 485.

The second factor for us to consider is the Commission's view of its own jurisdiction. *Zappone*, 349 Md. at 65, 706 A.2d 1060. In the case *sub judice*, the Commission considered almost all of the underlying factual allegations in appellant's judicial complaint, during either the informal PSC investigation in 1995 or its formal review of appellant's complaints in 1997. The only claim that the Commission declined to consider was that Bell Atlantic was engaged in an "ongoing scheme, or willful course of conduct ... designed to destroy the business of [appellant]," because the Commission lacked jurisdiction to award punitive and consequential damages. Thus, the Commission viewed its authority as encompassing all but one of appellant's many complaints.

Finally, we consider the third and last factor: whether appellant's "action is wholly or partially dependent upon the statutory scheme which also contains [its] administrative remedy or upon the expertise of the administrative agency." *Id.* at 65, 706 A.2d 1060. Unquestionably, most of appellant's claims were based on services Bell Atlantic was required to provide under the Act. Moreover, it is beyond cavil that many of appellant's claims required the expertise of the Commission to evaluate because they involved, among other things, providing faulty circuits or failing to provide new or additional circuits and then overbilling or incorrectly billing for the circuits provided. Thus, the instant case factually stands in stark contrast to *Zappone* in which the Court of Appeals found the administrative remedy in question to be concurrent. In so finding, the Court stressed that "[t]he plaintiffs' asserted causes of action in deceit and negligence [that were] wholly independent of the Insurance Code's Unfair Trade Practices subtitle" and that "no interpretations or applications of the

Insurance Code or of any regulations by the Insurance Commissioner [were] involved." *Id.* at 67, 706 A.2d 1060.

After applying the factors promulgated by the Court of Appeals in *Zappone* for determining the relationship between administrative and independent judicial remedies, we conclude that the PSC administrative remedy is primary and not exclusive or concurrent. Therefore, appellant is required first to exhaust the administrative remedy provided by the Act before resorting to independent judicial action.

In the case *sub judice,* appellant first invoked the administrative remedy of the Commission as it was required to do by law. It did not, however, exhaust that remedy before filing the complaint at issue in the circuit court. In fact, the Commission's proposed order became final while this appeal was pending. Appellant thereafter appealed the Commission's decision to the circuit court for the limited judicial review provided by the Act. Once that review is completed, appellant may pursue an independent action in the circuit court. Accordingly, we reverse the judgment of the circuit court, dismissing appellant's complaint, and remand this case to the circuit court with directions to stay all proceedings until appellant has exhausted the administrative remedy in question.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED, AND CASE REMANDED TO THAT COURT FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEE.**