689 A.2d 59

Larry G. TAYLOR

v.

Alvin E. FRIEDMAN et al.

No. 2, Sept. Term, 1996.

Court of Appeals of Maryland.

Feb. 13, 1997.

Don Charles Uthus, Annapolis, for petitioner.

Kenneth J. MacFadyen (James J. Loftus, Friedman & MacFadyen, P.A., on brief), Baltimore, for respondents.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI and RAKER, JJ., and ROBERT C. MURPHY (retired), Specially Assigned.

RODOWSKY, Judge.

This case arises on a counterclaim to the foreclosure of a deed of trust. The issue is whether Maryland Code (1975, 1990 Repl.Vol.), § 12–121 of the Commercial Law Article (CL) prohibits a mortgagee from charging the mortgagor fees for post-default, visual inspections of the mortgaged residence's exterior that are made to ascertain the condition of the security. Section 12–121 reads:

> **"Lender's inspection fees.**
>
> "(a) *Defined.*—In this section, the term 'lender's inspection fee' means a fee imposed by a lender to pay for a visual inspection of real property.
>
> "(b) *Imposition.*—Except as provided in subsection (c) of this section, a lender may not impose a lender's inspection fee in connection with a loan secured by residential real property.
>
> "(c) *When permitted.*—A lender's inspection fee may be charged if the inspection is needed to ascertain completion of:
>
> "(1) Construction of a new home; or
>
> "(2) Repairs, alterations, or other work required by the lender.
>
> "(d) *Applicability of section to appraisals.*—This section does not apply to an appraisal of the value of real property by a lender or to fees imposed in connection with an appraisal."

The deed of trust on the residence involved in this case was executed on April 29, 1986. Larry G. Taylor (Taylor), the petitioner, acquired the property on October 30, 1987, and assumed his grantor's obligations under the deed of trust. The respondents are substitute trustees under the deed of trust who were designated by Margaretten & Company, Inc., the holder of the note secured by the deed of trust when the

foreclosure was instituted. Margaretten & Company, Inc. subsequently was acquired by Bank of America, F.S.B. and renamed BA Mortgage, a division of Bank of America, F.S.B. We shall refer to the entity that held the note at any given time as "Lender." The loan, which was originally for $70,500, was insured under the National Housing Act.

From time to time Taylor was delinquent in making the monthly payments on the note. When a delinquency continued for more than forty-five days from the due date, Lender caused the property to be inspected by an independent organization and charged Taylor's account $10.00 as an inspection fee on each such occasion. Taylor did not believe that the charges were part of his contract and protested them, but Lender took the position that the charges were lawful. Then Taylor discovered CL § 12–121. In April and July 1993 Taylor wrote to Lender, pointing out that the inspection charges were illegal and carried criminal penalties,[1] and he requested a refund of all such fees that he had paid. When Lender either did not respond, or did not respond to Taylor's satisfaction, he stopped making any payments on the loan.

Eventually Lender instituted foreclosure in the Circuit Court for Anne Arundel County on July 5, 1994, after Taylor had failed to make any payments following the September 1, 1993 payment. This default caused Lender to have the property inspected in December 1993 and in April, May, June, and July 1994. The total of $50 for these inspections was charged to Taylor in the statement of mortgage debt filed with the foreclosure papers. The parties advised us at oral argument that, from the time when Taylor assumed the deed of trust obligations, approximately $180 had been charged against his account for inspection fees.

Lender caused the inspections to be made in order to comply with the "Protection and Preservation Fee Schedule" promulgated by Region III of the United States Department

---

1. Under CL § 12–122 a willful violation of § 12–121 carries a fine not exceeding $500 or imprisonment not exceeding six months, or both.

of Housing and Urban Development (HUD). The schedule effective January 15, 1993, (the Schedule) states that "[m]ortgagees are expected to exercise the same level of diligence and prudence in protecting and preserving vacant FHA insured properties that would be provided if they could look only to the security for recovery." Schedule at 1. The inspections of the type ordered by the Lender in this case are addressed in the Schedule as follows:

"When a mortgage is in default and a payment is not received within 45 days of the due date, and efforts to reach the mortgagor by telephone or other means within that period have proven unsuccessful, the mortgagee shall make a visual inspection of the property to determine occupancy status.

. . . .

"If the property is occupied, the mortgagee should continue to try to make contact with the mortgagor or occupant each month by telephone or through correspondence. If the mortgagee is unable to contact the mortgagor or occupant by any other means, the property should be reinspected within 30 days of the last inspection or last documented contact with the mortgagor or occupant."

Schedule at 2–3.

Fifteen dollars is the "maximum fee for all inspections (initial, vacant and occupied) ... for a single family property...." Schedule at 14. Inspection fees, up to the maximum allowable, are reimbursable to the mortgagee by HUD if the inspection is necessary, *i.e.*, when it cannot be established by other means whether the property is occupied. The Schedule provides that "[t]he mortgagee must inspect a vacant or abandoned property every 30 days when a loan is in default to determine whether protection and preservation action is necessary."[2] Schedule at 3.

---

2. In the instant matter, Lender's representative testified that the December 1993 report indicated "that the property was occupied by the mortgagor according to the mailbox," while the reports in the spring

Taylor, acting *pro se,* intervened in the foreclosure proceeding and filed a counterclaim, asserting, *inter alia,* that Lender had breached the loan contract by unlawfully assessing inspection fees in violation of CL § 12–121. At the same time Taylor paid into the registry of the court $7,241.70 which he calculated to be the full amount owed to Lender with the exception of the disputed inspection fees. Taylor also petitioned for, and obtained, an injunction against the foreclosure. In August 1994 Lender drew down the funds paid into court, with accumulated interest, and, on December 14, 1994, trial was had on Taylor's counterclaim, resulting in judgment for the counterclaim defendants.

The circuit court ruled that the prohibition of the statute was limited to inspection fees that were assessed as part of closing costs. The statute on which the circuit court based its ruling was CL § 12–1027 (1996 Cum.Supp.) that was enacted after § 12–121.[3] In Part I, *infra,* of this opinion we address how this case veered off to CL § 12–1027, and we address the interrelationship between that statute and CL § 12–121. In construing CL § 12–1027 the circuit court was persuaded by the short title, namely, "Housing—Real Property Closing

---

and summer of 1994 stated that the occupant was unknown, per visual inspection.

**3.** CL § 12–1027 (1996 Cum.Supp.) reads as follows:

"(a) *Definition.*—In this section, 'lender's inspection fee' means a fee imposed by a credit grantor to pay for a visual inspection of residential real property.

(b) *Not imposed.*—Except as provided in subsection (c) of this section, a credit grantor may not impose a lender's inspection fee in connection with a loan made to a consumer borrower that is secured by residential real property.

(c) *Imposed.*—A lender's inspection fee may be imposed on a consumer borrower if the inspection is needed to ascertain completion of:

(1) Construction of a new home; or

(2) Repairs, alterations, or other work required by the credit grantor.

(d) *Appraisals.*—This section does not apply to an appraisal of the value of real property by a credit grantor or to fees imposed in connection with an appraisal."

Costs," of Chapter 628 of the Acts of 1986 which enacted CL § 12–121, the earlier of the two, substantially similar statutes.

Taylor noted an appeal to the Court of Special Appeals from the judgment denying his counterclaim. In that court he briefed the matter *pro se.* The Court of Special Appeals, in an unreported opinion, affirmed the circuit court, agreeing that CL § 12–1027, construed in the light of its purpose, was limited to closing costs.[4] We granted Taylor's petition for certiorari that was prepared by his present appellate counsel.

■ Approximately three months after the decision by the Court of Special Appeals in the instant matter, Lender dismissed without prejudice the foreclosure action against the property. At oral argument we were advised that Taylor had sold the property.[5]

## I

In his argument to the circuit court Taylor thought that § 12–121 had been amended and that it was "now called 12–1027." His brief in this Court describes § 12–1027(b) to have been "[p]reviously designated as" § 12–121(b). Brief of Appellant at 2 n. 1. There are in fact two separate statutes

---

4. The circuit court had alternatively ruled, based on Taylor's testimony that he no longer lived in the house but had rented it to a tenant, that Taylor had no standing to invoke CL § 12–1027. Lender did not brief this ground in the Court of Special Appeals as an alternative basis for supporting the judgment of the circuit court, and the issue was not raised by Lender in a conditional cross-petition for certiorari. Accordingly, we intimate no opinion on the construction of the statute implicit in the circuit court's alternate ground of decision.

5. It appears that there was no final judgment in the action when Taylor noted his appeal to the Court of Special Appeals. The Lender's foreclosure proceeding is considered as a claim and Taylor's counterclaim is a counterclaim in the same action. *Fairfax Savings, F.S.B. v. Kris Jen Ltd. Partnership,* 338 Md. 1, 21–22, 655 A.2d 1265, 1274–75 (1995). Taylor appealed only the judgment on the counterclaim at a time when the claim was still pending on the docket. On our own initiative, however, we enter a final judgment on the counterclaim. Maryland Rule 8–602(e)(1)(C).

dealing with the same subject matter in substantially the same way.

CL § 12–121 was initiated by the Report of the Task Force on Real Property Closing Costs (the Commission) that had been created by Governor Harry R. Hughes and that reported in January 1986. The bill proposing certain legislation recommended by that Commission was enacted by Chapter 628 of the Acts of 1986.

By Chapter 143 of the Acts of 1983 the General Assembly had enacted the Credit Deregulation Act of 1983 (CDA). Among its provisions are CL Title 12, Subtitle 9, "Credit Grantor Revolving Credit Provisions" (OPEC), dealing with open end credit, and CL Title 12, Subtitle 10, "Credit Grantor Closed End Credit Provisions" (CLEC), dealing with closed end credit. When the legislation proposed by the Commission was drafted, introduced, and enacted, the various provisions were designated for codification solely as part of Subtitle 1 of Title 12, without duplicating some or all of the proposals in OPEC or in CLEC.[6]

In 1992 this Court's decision in *Biggus v. Ford Motor Credit Co.*, 328 Md. 188, 613 A.2d 986, analyzed the interrelationship between CLEC and the Retail Installment Sales Act, CL Title 12, Subtitle 6. *Biggus* pointed out that, under the language of the CDA, there could be provisions in CL Title 12, other than in OPEC and CLEC, that could apply to credit grantors who elected coverage under those subtitles.

As a direct result of *Biggus,* the General Assembly amended OPEC and CLEC by Chapter 404 of the Acts of 1993. These amendments specifically provide that, under certain circumstances, provisions of certain other subtitles of CL Title 12,

---

**6.** It is today only of academic interest whether this codification decision was prompted by the belief that the provisions of CL § 12–121, for example, would also be applicable to credit grantors who elected CLEC, because CLEC did not address inspection fees one way or the other. It seems clear in light of subsequent developments that the General Assembly did not intend credit grantors to be able to avoid the prohibitions of CL § 12–121 by electing to do business under CLEC.

including Subtitle 1, do not apply to extensions of credit under OPEC and CLEC. *See* CL (1996 Cum.Supp.), §§ 12–913, 12–913.1, 12–1013, and 12–1013.1.

Before the General Assembly could shut the door on the application of provisions in certain other subtitles of Title 12 to credit grantors who elected OPEC or CLEC, it was necessary for the General Assembly first. to determine which provisions in those other subtitles were intended to apply to credit grantors electing OPEC or CLEC and then to add those provisions to OPEC and CLEC. Falling within this class was § 12–121's prohibition against inspection fees. The substance of that statute was added in 1993 to CLEC by Chapter 404 as § 12–1027.

■ In the instant matter the deed of trust that Taylor assumed is a preprinted form document that was apparently drafted in 1982, prior to the enactment of the CDA. We do not find any election of CLEC in this deed of trust. Nor has Lender undertaken to show that the extension of credit to Taylor's grantor was made pursuant to CLEC. *Compare* CL (1996 Cum.Supp.) § 12–1013.1(c). Thus, the applicable section in the instant case is § 12–121, and, in Part II, *infra,* we shall recast the parties' arguments in terms of § 12–121. Nevertheless, because there is no substantial difference between § 12–121 and § 12–1027 with respect to the issue before us, our construction of the former is equally applicable to the latter.

## II

The sole issue before us under the certiorari petition is the construction of § 12–121. Lender never contended in its brief on direct appeal that the inspection fees are authorized to be imposed *on the borrower* by federal law or that the Maryland statutes are federally preempted as applied to the facts of this case. Nor does Lender argue that the Maryland statutes are

to be construed to avoid possible unconstitutionality under federal law.[7]

Taylor's position, quite simply, is that the inspection fees in this case fall within the plain language of § 12–121. Taylor's position is reinforced by the rule of statutory construction dealing with statutes that express a general rule, followed by one or more specific exceptions to the general rule. Under those circumstances, a court ordinarily cannot add to the list of exceptions. *See Gable v. Colonial Ins. Co.*, 313 Md. 701, 704, 548 A.2d 135, 137 (1988) ("[W]here the Legislature has required specified coverages in a particular category of insurance, and has provided for certain exceptions or exclusions to the required coverages, additional exclusions are generally not permitted."); *Schmidt v. Beneficial Fin. Co.*, 285 Md. 148, 155, 400 A.2d 1124, 1127 (1979) (where "Secondary Mortgage Loan Law [did] not expressly except loans meeting the criteria set out in the Consumer Loan Law," the court would not read "such an exception into the law.").

Lender argues that the language in § 12–121, "in connection with a loan," is ambiguous, in that it may deal only with the time of loan closing, or its scope may be broader. This effort to establish an ambiguity is designed to open the

---

**7.** HUD regulations, in 24 C.F.R. § 203.552 (1994), provide in relevant part as follows:

"(a) The mortgagee may collect reasonable and customary fees and charges from the mortgagor after insurance endorsement only as follows:

. . . .

"(14) Property preservation expenses incurred pursuant to § 203.377."

24 C.F.R. § 203.377 states in part as follows:

"The mortgagee, upon learning that a property subject to a mortgage insured under this part is vacant or abandoned, shall be responsible for the inspection of such property at least monthly, if the loan thereon is in default."

Assuming, *arguendo,* that HUD regulations are incorporated by law into the agreements between lenders and borrowers on insured loans, the circuit court never made any finding that the property was "vacant or abandoned" within the meaning of the regulation. In any event, Taylor's counterclaim also seeks a refund of inspection fees paid or charged prior to the time when he was no longer personally residing on the premises.

door for legislative history. Alternatively, Lender contends that a statute must always be construed in accordance with its purpose. Lender cites *Blaine v. Blaine,* 336 Md. 49, 64, 646 A.2d 413, 420 (1994), for the proposition that "[e]ven where the language of a statute is plain and unambiguous, [the Court] may look elsewhere to divine legislative intent; the plain meaning rule is not rigid and does not require [the Court] to read legislative provisions in rote fashion and in isolation." In accordance with the latter approach to statutory construction, we now turn to the legislative purpose.

There is no question but that the background for the creation of the Commission was concern over real property closing costs. Commission Report at 3. The Commission's recommendations, however, and the statutes that were based thereon, were not limited exclusively to closing costs. Chapter 628 of the Acts of 1986 enacted a prohibition against a Lender's imposing "a collection fee or service charge on the maintenance of an escrow account on a first mortgage or first deed of trust." 1986 Md. Laws at 2206, currently, with amendments, CL § 12–109.2. *See also* CL § 12–1026(e).

The prohibition against charging a service fee to maintain an escrow account is a continuing prohibition, throughout the life of the loan, and is not limited to closing costs. In explaining this recommendation the Commission in its report said, in part:

> "Most lenders require a borrower to make monthly payments into an escrow account in order to accumulate sufficient funds to pay property taxes, hazard insurance premiums and some other charges (e.g. ground rent) as they become due. . . .
>
> . . . .
>
> ". . . The Task Force is concerned, however, about information that some lenders impose a collection fee or service charge on the maintenance of required escrow accounts. Such additional fees, usually $30 to $50 annually, should be prohibited because funds are escrowed as a requirement of, and for the convenience and security of lenders."

Commission Report at 26–27.   In originally enacting CL § 12–109.2 the General Assembly had made no change from the statutory language proposed by the Commission.

Further, proposed § 12–121(c)(2), as introduced, would have permitted a fee for a lender's inspection to ascertain completion of "repairs, alterations or other work required by the lender *as a condition to granting the loan.*"   1986 Md. Laws at 2208 (emphasis added).   The italicized language indicates that the Commission's focus may well have been on inspection fees associated with a loan closing.   But the General Assembly struck the italicized language from the bill in the course of passage.

The effect of this amendment was to expand the exception to the prohibition so that inspection fees could be charged for ascertaining the completion of work that had nothing to do with granting the loan.   For example, in the instant matter, Taylor assumed the obligation in ¶ 5 of the deed of trust to "keep the said premises in as good order and condition as they are now … reasonable wear and tear excepted."   If Taylor had violated that covenant, and Lender and Taylor agreed that Lender would not treat the breach as a default if Taylor caused repairs to be made within a stated time, Lender would not be prohibited from charging an inspection fee to determine if those repairs had been made.   In terms of the issue before us, the amendment to the Commission's proposed statute concerning inspection fees indicates that the General Assembly did not consider that the prohibition against inspection fees was limited to closing costs.   Otherwise, there would have been no need to eliminate from the exception the limitation to conditions of granting the loan.   In other words, an exception for an inspection fee to determine if work had been done that was a condition of the loan would have been entirely adequate if the prohibition against inspection fees were limited to those charged as part of closing costs.   It is the intent of the General Assembly that we must discern, not that of the Commission.

For the foregoing reasons we conclude that the legislative history does not so clearly demonstrate a purpose to limit the prohibition of § 12–121 to closing costs as to override the plain language of the statute. Accordingly, we shall reverse and remand for further proceedings.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT REVERSING THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AND REMANDING THIS ACTION TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT, BANK OF AMERICA, F.S.B.**