782 A.2d 791

**BELL ATLANTIC OF MARYLAND, INC.**

v.

**INTERCOM SYSTEMS CORPORATION.**

**No. 13, Sept. Term, 2001.**

Court of Appeals of Maryland.

Oct. 10, 2001.

2

Ralph S. Tyler (Karen M. Hardwick, Rose Marie L. Audette of Hogan & Hartson, L.L.P., on brief), Baltimore, for petitioner.

William Ray Ford, Camp Springs, for respondent.

Tara Andrews, Deborah Thompson Eisenberg, Baltimore, brief of Amici Curiae the Public Justice Center and All Peoples Congress, filed on behalf of respondent.

Argued before BELL, C.J., WILNER, CATHELL, HARRELL, BATTAGLIA, and LAWRENCE F. RODOWSKY (retired, specially assigned), and ROBERT L. KARWACKI (retired, specially assigned), JJ.

BATTAGLIA, Judge.

We issued a writ of certiorari in this case to determine whether the administrative remedy before the Maryland Public Service Commission ("PSC" or "Commission") as set forth in Maryland Code, Section 3–101 et seq. of the Public Utility Companies Article (1998) is of an exclusive, primary, or concurrent nature with respect to alleged acts of tortious interference with contractual relations, negligence, and breach of contract in connection with the provision of telephone services by petitioner Bell Atlantic of Maryland, Inc. ("Bell Atlantic") to respondent Intercom Micro Systems, Inc. ("Intercom"). The Court of Special Appeals held that the statutory remedy provided by the Public Utility Companies Article was primary for consumer complaints against public service companies. We now affirm.

## I.  Facts

Respondent Intercom is an internet service provider in the Washington, D.C. metropolitan area. The company was start-

ed in 1993 by its owner, Mark S. Ballard, who currently runs the business from his home in Clinton, Maryland. Petitioner Bell Atlantic of Maryland, Inc. ("Bell Atlantic") serves as the local exchange carrier providing telephone service to Clinton, Maryland, which includes the business telecommunications services for Intercom. In 1995, Intercom filed seven complaints against Bell Atlantic with the PSC's Office of Consumer Assistance and Public Affairs ("CAPA"), alleging that Bell Atlantic provided inadequate telecommunications services, engaged in improper billing, and discriminatory treatment.[1]

In one complaint, Intercom alleged that Bell Atlantic service outages affecting the dedicated service line being provided to one of Intercom's clients resulted in the loss of Intercom's business with that client. In a separate complaint, Intercom detailed how its incoming phone calls were being routed to one of its competitors located in Laurel, Maryland. The remaining five complaints recounted the numerous losses Intercom

---

1. In addition to formal complaints which may be filed with the PSC pursuant to Maryland Code, Section 3–102 of the Public Utility Companies Article, consumers may have their disputes with utilities "reviewed, investigated, or resolved by the Office of External Relations" of the PSC. COMAR 20.32.01.01. The PSC's Office of External Relations ("OER"), as referred to in COMAR, and the PSC's Office of Consumer Assistance and Public Affairs ("CAPA") are one and the same entity.

A consumer of services provided by a public service company may submit an inquiry or dispute concerning problems with service or pricing directly to the utility company. The utility must then make an investigation of the claim and report its findings to the consumer. *See* COMAR 20.32.01.03(B). When a consumer disputes the utility's findings, the consumer may submit an inquiry to the PSC for further investigation and review by the OER/CAPA. *See* COMAR 20.32.01.04(A). Following a final determination by the OER/CAPA, a party who seeks further review of an inquiry or dispute must file a written request with the Assistant Manager of OER/CAPA specifying the reasons for which it requests further review, the type of relief sought, and any additional facts or documentation relevant to the resolution of the issue. *See* COMAR 20.32.01.04L. Following a review of the request, the Assistant Manager must advise the parties of his disposition of the request for additional review. *See* COMAR 20.32.01.04L(4). At that time, the parties may decide to appeal the decision of the Assistant Manager by filing a formal complaint with the PSC pursuant to Section 3–102 of the Public Utility Companies Article. *See* COMAR 20.32.01.04M.

sustained which were allegedly attributable to instances of Bell Atlantic's inadequate service and substandard customer service responses to complaints lodged by Intercom.[2]

During January and February of 1997, Intercom filed an additional sixteen complaints with the PSC's CAPA Office. Intercom asserted that Bell Atlantic had failed again to provide Intercom with adequate service, billed Intercom incorrectly for the services, and engaged in discriminatory practices. Bell Atlantic conducted an investigation of these complaints, and filed reports with the PSC. On April 11, 1997, the CAPA Office issued a "final response," in which it found that Bell Atlantic had not violated any of the PSC's approved tariffs (fee schedules) and had not acted in bad faith with respect to the provision of telecommunication services to Intercom. The PSC informed Intercom that pursuant to COMAR 20.32.01.04A and 20.07.03.04, it had a ten day period in which it could appeal the findings of the CAPA Office by filing a formal complaint with the full Commission.[3]

---

2. Representatives of Bell Atlantic, Intercom, and the technical staff of the PSC's Telecommunications Division met to discuss the complaints on July 27, 1995. At that time, all parties present at the meeting "agreed to meet certain deadlines in responding to specific data requests." Letter from Frank B. Fulton, Jr., Director, Consumer Assistance and Public Affairs, to counsel for respondent, Douglas L. Worthing (August 31, 1995). Although there was some indication that Intercom had unresolved issues remaining with Bell Atlantic following the July 27th meeting, Intercom did not appeal the findings of the CAPA Office to the PSC, stating, "[t]he Public Service Commission has fulfilled every fair aspect of this complaint." Letter from Mark Ballard, President, CEO Intercom Systems Corp. to Frank B. Fulton, Jr. (September 28, 1995).

3. COMAR 20.32.01.04A provides that, "[i]f a customer disputes a utility's determination under Regulation .03 of this chapter, the customer may submit an inquiry to the Commission within 7 days of receipt of the utility's determination." COMAR 20.07.03.04 sets forth the appeals procedure from decisions of the PSC as follows:

When an appeal from COMAR 20.32 is received, the Commission may:

A. Determine whether relief should be granted based on the information submitted by the complainant/appellant, the public ser-

On April 21, 1997, Intercom filed a formal complaint with the PSC, in which it incorporated the sixteen original complaints it had filed previously with the CAPA Office in 1997. Intercom also filed a seventeenth complaint seeking damages for harm suffered by Intercom as a result of Bell Atlantic's allegedly willful and intentional conduct. Intercom's damages claimed before the PSC were of a compensatory and punitive nature. Bell Atlantic interjected jurisdictional defenses to Intercom's claims by asserting that Intercom's request for compensatory and punitive damages went beyond the statutory authority of the PSC.

The PSC determined that it had jurisdiction to entertain Intercom's complaints with regard to fee schedules, since these issues were not preempted by the Federal Communications Act, 47 U.S.C. § 151 (1991). Intercom's complaints of Bell Atlantic's allegedly willful and intentional conduct interfering with Intercom's business relations, were addressed by the PSC's hearing examiner as follows:

The business relationship between [Intercom] and [Bell Atlantic] has been one in which [Intercom] has found it necessary to file repeated complaints with this Commission in order to rectify what it considered serious and willful actions taken against it by [Bell Atlantic]. [Intercom] argues that the actions of Bell Atlantic [are] evidence of its intent to destroy the business. Obviously, Bell Atlantic denies such a charge. Nonetheless, it is entirely understandable that [Intercom] would draw such a conclusion. [Bell Atlantic] is a sophisticated company with technological and management systems in place to provide reliable service to its customers. The cummulative [sic] affect[sic] of the actions described in the [Intercom] complaints certainly belie the standard of reliability expected of Bell Atlantic.

---

vice company, and the investigation of the Office of External Relations;

B. Dismiss the appeal if it fails to state a claim upon which relief can be granted; or

C. Conduct further investigations, proceedings, or hearings as necessary.

Therefore, it is, indeed, very troublesome that this succession of problems has occurred. Moreover, it is reasonably foreseeable that the repeated problems could and probably did have serious economic consequences to [Intercom]. However, it is not necessary to decide whether Bell Atlantic's action was taken for the intended purpose to destroy the [Intercom] business. Simply put, the [Intercom] claim for economic damage seeks to obtain a remedy that is beyond the boundary of the tariffs or the Commission's statutory authority. Although [Intercom] argues strongly that the action against it was taken with the intent of destroying the business, that allegation cannot be the basis for providing a remedy that is not authorized by statute. There are "numerous decisions that hold that the Commission cannot award monetary damages or assess fines save those specifically provided by statute." *See [In re] Re: The Washington Post Company,* 88 Md. PSC 183, 185[, 1997 WL 1008383] (1997).

Proposed Order of Hearing Examiner, *In the Matter of the Complaint of IMS Intercom Against Bell Atlantic–Maryland, Inc.* (Dec. 23, 1999).[4] It concluded it lacked the authority to entertain Intercom's request for punitive and consequential damages, the PSC granted Bell Atlantic's Motion for Summary Dismissal.

In addition to the administrative remedies available under Sections 3–101 through 3–209 of the Public Utility Companies Article of the Maryland Code, Intercom sought direct judicial relief in the form of an independent judicial action. On April 16, 1997, Intercom filed a lawsuit against Bell Atlantic in the Circuit Court for Prince George's County, alleging tortious interference with contractual relations, negligence, and breach of contract. Intercom alleged that Bell Atlantic intentionally

---

**4.** The Proposed Order stated that it would become a final order of the PSC on January 25, 2000, unless prior to the expiration of that period, a party or the PSC "modifies or reverses the Proposed Order or initiates further proceedings in this matter as provided in Section 3–114(c)(2) of The Public Utility Companies Article." *See* Md.Code, § 3–113(d)(2) of the Public Utility Companies Article.

interfered with Intercom's business because it, either directly or through its subsidiaries, was a direct competitor of Intercom in providing internet access services to the general public. Specifically, Intercom alleged that beginning in May of 1994, Bell Atlantic failed to promptly provide Intercom with new or additional circuits to accommodate its expanding business. Intercom asserted that those circuits that Bell Atlantic had provided repeatedly failed in their performance or were of low quality. The complaint also alleged that Bell Atlantic improperly charged Intercom for the services which it provided, and that Bell Atlantic engaged in conduct which demonstrated billing and service preferences for Intercom's competitors. In support of its allegations of discriminatory treatment, Intercom asserted that Bell Atlantic had rerouted or forwarded Intercom's voice lines to competitor internet service providers, and that Bell Atlantic had refused to list Intercom in the White Pages or in its 411 Information Directory listings, although Intercom had ordered such service. Based on these allegations, Intercom sought judicial relief in the form of compensatory and punitive damages.

In response, Bell Atlantic filed a motion to dismiss Intercom's complaint for failure to state a claim upon which relief could be granted by the court because Intercom's claims fell "squarely within the exclusive jurisdiction of the Maryland Public Service Commission," pursuant to the Public Utility Companies Article of the Maryland Code. Thus, Bell Atlantic argued that the only judicial determination available to Intercom would be judicial review of a final order of the PSC, which had not been issued at that time.

On November 14, 1997, the Circuit Court for Prince George's County heard Bell Atlantic's motion to dismiss, at which time Intercom argued that the claims it raised against Bell Atlantic were of a hybrid nature-some could be addressed by the PSC and others were common law tort claims which could be pursued in an independent judicial action. The trial court gave the following rationale for its dismissal of Intercom's suit:

I believe that the allegations raised in the complaint are within the exclusive jurisdiction of the Public Service Commission. The cases cited in support of the Court retaining jurisdiction or staying [sic] that we somehow have some type of concurrence [sic], successive concurrence [sic] jurisdiction [is not persuasive].

\* \* \*

The allegation that the Public Service Commission cannot make the Plaintiff whole was raised in Bits 'N' Bytes, and Judge Motz and the panel did not find that persuasive.

Certainly the matters raised in the complaint about that, I went over, five out of seven fall within the Public Service Commission. In looking at others in the charge, the remaining two, it seems, would be in the courts, which really do, when they look at these situations, ask was there a right that existed at common law that has been infringed? And if you were to look at any of the allegations raised, there really wouldn't be a common law or statutory legally created cause of action. And there's no third party involved.

This is not a situation in which the Defendant is deemed or asserted to have conspired with another party. There, the common law action would be conspiracy and the third party clearly couldn't be brought before the PSC and this Court would have jurisdiction.

I read the issues that were raised in the complaint and if there is ever a case that would cry out for administrative expertise, indeed, it is in six of the seven issues that are raised with regard to the assignment of lines whether there was even good or bad quality, the assignment of circuits and things of that nature clearly are within the administrative agency's expertise.

I do find that the Public Service Commission has primary jurisdiction, and, secondarily, I find this jurisdiction is exclusive. Therefore, there is no reason to stay this case, and, therefore, the motion to dismiss is granted and this case is closed statistically.

On December 5, 1997, Intercom filed a notice of appeal to the Court of Special Appeals pursuant to Maryland Code, § 12–301 of the Courts and Judicial Proceedings Article (1974, 1995 Repl. Vol., 1997 Supp.) regarding the circuit court's dismissal in favor of Bell Atlantic. The Court of Special Appeals reversed the judgment of the circuit court. *See Intercom Sys. Corp. v. Bell Atlantic of Maryland, Inc.*, 135 Md.App. 624, 627, 763 A.2d 1196, 1197 (2000). The Court of Special Appeals held that the administrative remedy available to Intercom through the Public Utility Companies Article was primary, rather than exclusive or concurrent, based upon the comprehensive nature of the administrative scheme established for the PSC. *Id.* at 644, 763 A.2d at 1206. On the other hand, the Court of Special Appeals reasoned that the administrative remedy available under the Public Utility Companies Article could not be exclusive because:

> [I]t is highly unlikely that the Legislature, in creating the administrative remedy in question to address regulatory problems and common consumer complaints before the Commission, intended to shield the public utility companies and their subsidiaries from lawful competition. But that's precisely what would occur if we found the PSC remedy to be exclusive. To so rule would, in effect, leave their competitors, big and small, without any means of seeking economic redress even when, as allegedly occurred here, they have been economically damaged, or in some cases even driven out of business, by the practices of a public utility company.

*Id.* at 641, 763 A.2d at 1205.

On February 6, 2001, Bell Atlantic filed a Petition for Writ of Certiorari in this Court. We granted the petition, and now consider whether the administrative remedy of the PSC is exclusive, primary or concurrent with alternative judicial remedies. We respond to this inquiry by holding that the administrative remedy of the PSC is primary for consumer complaints, which may be brought under Section 3–101 et seq. of the Public Utility Companies Article of the Maryland Code. Consumers must exhaust the statutory remedies provided

therein before pursuing available independent judicial relief in the form of common law actions.

## II. Discussion

■ The question Bell Atlantic has posed to this Court requires an examination of the scope and purpose of the statutory scheme embodied in the Public Utility Companies Article involving public service companies who are in the business of providing telephone service within Maryland. The proceeding for judicial review in cases governed by the Public Utility Companies Act shall be heard in "the circuit court in equity for any county in which the public service company involved in the proceeding operates" or in "the Circuit Court in equity for Baltimore City." Md.Code, § 3–204(a) of the Public Utility Companies Article. It stands to reason that this circumscribes the types of relief the circuit court may grant in this specialized judicial proceeding. While comprehensive in nature, the regulatory framework of the Public Utility Companies Article is not all-encompassing so as to preempt all fora where potential claims may arise against public service companies. In *Zappone v. Liberty Life Ins. Co.*, 349 Md. 45, 706 A.2d 1060 (1998), this Court analyzed the relationship between statutorily provided administrative remedies and coextensive judicial remedies and defined three different frameworks as follows:

> First, the administrative remedy may be exclusive, thus precluding any resort to an alternative remedy. Under this scenario, there simply is no alternative cause of action for matters covered by the statutory administrative remedy.

> Second, the administrative remedy may be primary but not exclusive. In this situation, a claimant must invoke and exhaust the administrative remedy, and seek judicial review of an adverse administrative decision, before a court can properly adjudicate the merits of the alternative judicial remedy.

\* \* \*

Third, the administrative remedy and the alternative judicial remedy may be fully concurrent, with neither remedy being primary, and the plaintiff at his or her option may pursue the judicial remedy without the necessity of invoking and exhausting the administrative remedy.

*Zappone,* 349 Md. at 60–61, 706 A.2d at 1067–68. We emphasized that "where neither the statutory language nor the legislative history disclose an intent that the administrative remedy is to be exclusive, and where there is an alternative judicial remedy under another statute or under common law or equitable principles, there is no presumption that the administrative remedy was intended to be exclusive." *Zappone,* 349 Md. at 63, 706 A.2d at 1069. Instead, we found a rebuttable presumption that in the absence of specific statutory language indicating otherwise, an administrative remedy was intended to be primary. *See id.* at 63–64, 706 A.2d at 1069. In evaluating this presumption, we are encouraged to consider numerous factors, including the "comprehensiveness of the administrative remedy," the agency's view of the scope of its jurisdiction, and the "nature of the alternative judicial cause of action pursued by the plaintiff" in refuting the presumption that the legislature intended the administrative remedy to be primary. *See id.* at 64–65, 706 A.2d at 1070.

The determination of whether the administrative remedy of the Public Utility Companies Article was intended to be exclusive, primary, or concurrent requires an examination of the language of the statute itself as a point of departure, and subsequent exploration of its underlying policies. *See Mid–Atlantic Power Supply Ass'n v. Pub. Serv. Comm'n of Maryland,* 361 Md. 196, 203–04, 760 A.2d 1087, 1091 (2000); *Read v. Supervisor of Assessments of Anne Arundel County,* 354 Md. 383, 392–93, 731 A.2d 868, 873 (1999); *Board of License Comm'rs for Charles County v. Toye,* 354 Md. 116, 122, 729 A.2d 407, 410 (1999). In the present case, however, the statutory language does not define whether the PSC has exclusive, primary, or concurrent jurisdiction to hear consumer complaints brought against the public service companies it regulates.

■    Therefore, we must interpret the intention of the General Assembly in enacting the regulatory scheme now known as the Public Utility Companies Article of the Maryland Code, thereby creating the PSC. *See Taylor v. Friedman,* 344 Md. 572, 582, 689 A.2d 59, 63 (1997); *Maryland Reclamation Assocs. v. Harford County,* 342 Md. 476, 493, 677 A.2d 567, 576 (1996); *Maryland–National Capital Park & Planning Comm'n v. Crawford,* 307 Md. 1, 14–15 n. 5, 511 A.2d 1079, 1086 n. 5 (1986). Where we seek to ascertain legislative intent in the absence of specific statutory language, we must explore the context in which the statute was enacted. *See Baltimore Harbor Charters, Ltd. v. Ayd,* 365 Md. 366, 377, 780 A.2d 303, 310 (2001); *Tipton v. Partner's Management Co.,* 364 Md. 419, 435, 773 A.2d 488, 497–98 (2001). The context of a statute "may include related statutes, pertinent legislative history and other material that fairly bears on the . . . fundamental issue of legislative purpose or goal . . ." *Graves v. State,* 364 Md. 329, 347, 772 A.2d 1225, 1236 (2001)(quoting *GEICO v. Insurance Comm'r,* 332 Md. 124, 132, 630 A.2d 713, 717 (1993)); *see Mayor & City Council of Baltimore v. Chase,* 360 Md. 121, 131, 756 A.2d 987, 993 (2000).

On January 5, 1910, Maryland Governor Austin L. Crothers sent a letter to the Maryland Senate and House of Delegates, reminding the General Assembly of the promises made in the Democratic Platform of 1909. With regard to the formation of a Public Utilities Commission, the platform declared:

> The reasonable and just regulation of public-service corporations through the agency of a commission with prescribed powers and duties has, as a policy, been adopted by a number of the largest and leading States of the Union, and is under favorable consideration in many other States. A quarter of a century ago, approximately, the Federal Government led the way in the pursuance of this important policy by the establishment of the Interstate Commerce Commission. Many of the States of the Union have for years had railroad commissions for the reasonable regulation of the service afforded and the rates charged by common carriers. And the functions of these commissions

in various parts of the Union are being extended so as to embrace the power and duty of regulative control over other public utilities and accommodations. In the States of New York and Wisconsin, and in the Southern States of Virginia and North Carolina experience has shown that such commissions furnish appropriate and essential protection to the rights and interests of the public, whilst at the same time they afford important and just safeguards and immunities to the public-service corporations themselves. The fact is so obvious as to dispense with the necessity of prolonged discussion that a public-service commission in the State of Maryland, as in other States, will shield and secure the people from injustice, abuse and disadvantages of whatsoever form at the hands of great corporations engaged for their own profit in the sale and supply of utilities and service of a general and public nature, and will reasonably guarantee to the people adequate and proper service at just prices. The people are entitled to this in respect to the utilities in question—that is to say, they are entitled to justice—no more, no less. On the other hand, the same measure of regard and consideration is due to the capital and corporate and personal interest engaged and involved in the organization and maintenance of the public-service corporations of this State. These institutions, it cannot be denied, are often subjected to unreasonable demands and unjustifiable attacks. They, too, are entitled to justice-no more, no less. A public-service commission clothed with the necessary powers and charged with appropriate functions, and above all else, composed of men imbued with a full measure and high standard of intelligence, character and public spirit, would meet these requirements and subserve and accomplish the great public end in view, which, after all, is the full preservation to the people of the rights and advantages to which they are justly entitled without imposing unnecessary or unreasonable burdens upon the corporations in question. To effect this rightful object, which, indeed, is one of the salutary ends of government itself, it is indispensable not only that such a commission be provided for by the Legisla-

ture, but that it be vested with full and plenary powers to effectually and impartially accomplish its important object with respect to all public-service corporations in the State in their various relations to the people. This is the spirit and design of the pledge we made to the people. Without hesitancy or shortcoming in any particular, let us now faithfully redeem it.

Letter from Maryland Governor Austin L. Crothers to the Senate and House of Delegates (January 5, 1910), at 4–6.

With the task of providing justice for consumers clearly set forth, the General Assembly enacted the Public Service Commission Law on April 5, 1910. The statute set forth a regulatory scheme and created the PSC in order "to provide for the regulation and control of public service corporations and public utilities, and making appropriations therefor." 1910 Md. Laws, ch. 180. The statute required that all telegraph and telephone companies "provide such service and facilities as shall be adequate, just and reasonable" in a non-discriminatory fashion. It also gave the Commission broad authority and discretion to monitor and regulate corporate behavior.[5] 1910 Md. Law, ch. 180, § 40. The statute also

---

**5.** Chapter 180, Section 39 of the 1910 Laws of Maryland set forth the broad regulatory powers of the Commission with regard to telephone and telegraph companies as follows:

The Commission shall have within its discretion (1) general supervision of all persons having authority under any general or special law or under any charter or franchise to lay down or erect or maintain poles, wires, pipes, conduits or other fixtures in, over or under the streets, highways and public places for the purpose of furnishing facilities for the transmission of intelligence by electricity. (2) Shall investigate and ascertain from time to time, the service supplied by such persons and corporations; shall examine all the methods employed by such persons and corporations supplying facilities for the transmission of intelligence by electricity, and shall have power to order such improvements as will best promote the public interest and protect those using telephones and those employed in the business thereof or in the maintenance and operation of the works, wires, poles, lines and conduits maintained therein. (3) Shall have power, in its discretion, to prescribe and require items, methods of keeping accounts, records and books to be furnished by the persons and corporations engaged in the furnishing of facilities for the transmission of intelligence by electricity. (4) Shall examine all persons

empowered the Commission to hold hearings concerning the adequacy of service and order repairs as necessary to improve

and corporations under its supervision as to the methods employed by them in the transaction of their business, see that their property is maintained and operated for the reasonably adequate accommodation of the public and in compliance with the provisions of law and of their franchise and charters. (5) Shall require every person or corporation under its supervision to submit to it an actual report, verified by the oath of the president, treasurer or general manager, showing in detail (a) the amount of its authorized capital stock and the amount thereof issued and outstanding; (b) the amount of its authorized bonded indebtedness and the amount of its bonds and other forms of evidence of indebtedness issued and outstanding; (c) its receipts and expenditures during the preceding year; (d) the amount paid as dividends upon its stock and as interest upon its bonds; (e) the name of and the amount paid as salary to each officer, and the amount paid as wages to its employees; (f) the situation of its plant or plants and system, with a full description of its property and franchises, stating in detail how each franchise stated to be owned was acquired, and (g) such other facts pertaining to the operation and maintenance of the plant and system, and the affairs of such person or corporation, as may be required by the Commission. Such reports shall be in the form, cover the period and be submitted at the time prescribed by the Commission. The Commission may, from time to time, make changes and additions in such forms, giving to the persons and corporations three months' notice before the time fixed by the Commission as the expiration of the fiscal year of any changes or addition which would require any alteration in the method or form of keeping their accounts for ensuing year. When any such report is defective, or believed to be erroneous, the Commission shall notify the person or corporation making such report to amend the same within thirty days. Any such person or corporation which shall neglect to make any such report within the time specified by the Commission, or which shall fail to correct any such report within fifteen days after notice, shall be liable to a penalty of one hundred dollars and an additional penalty of ten dollars for each day after the prescribed time for which it shall neglect to file or correct the same, to be sued for in the name of this State. The amount recovered in such action shall be paid into the State Treasury and be credited to the general fund. The Commission may extend the time herein limited for cause shown.

Shall have power, either through its members or inspectors or employees duly authorized by it, to enter in or upon and to inspect the property, buildings, plants, factories, power-houses and offices of any such corporations or persons.

Shall have power to examine the books and affairs of any such corporation or person, and to compel the production before it of books and papers pertaining to the affairs being investigated by it.

Shall have plenary power to make all valuations of the lines, property, plant, franchises and assets of such corporations.

such service. *See* 1910 Md. Laws, ch. 180 § 40. Thus, in an early case involving the interaction of the Public Service Commission Law and a municipal charter, this Court explained:

> The Legislature of 1910 took up, and for the first time in this State, enacted a law for the purpose of regulating in various ways the class of corporations or firms conducting public utilities. The grant of power as contained in the Act, while in general language, was intended to be extremely comprehensive.

*Mayor of Crisfield v. Chesapeake & Potomac Tel. Co.*, 131 Md. 444, 446, 102 A. 751 (1917).

Over the next several decades, the General Assembly revised the language of the Public Service Commission Law, streamlining the statute without altering the regulatory function of the PSC or affecting the substantive rights of parties who filed complaints with the Commission. For example, Article 78 of the Maryland Code (1951) elucidated the scope of the investigatory and regulatory powers of the Commission in a more concise fashion, as follows:

> The Commission shall have full power and authority to make joint investigations, hold joint hearings, and issue joint or concurrent orders in conjunction or concurrence with any official board or commission of any state or of the United States, whether in the holding of such investigations or hearings or in the making of such orders the Commission shall function under agreements or compacts between states, or under the concurrent power of states to regulate interstate commerce, or as an agency of the Federal Government, or otherwise.

Md.Code, Art. 78 § 5 (1951).[6] The 1955 Laws of Maryland repealed and reenacted a new Article 78, which again, reenforced the responsibility of the Commission to supervise,

---

6. To examine the development and reorganization of the Public Service Commission Law in the first forty years of its existence, *see* Maryland Code, Art. 23, § 344 et seq. (1939); Maryland Code, Art. 23, § 346 et seq. (1924); Maryland Code, Art. 23, § 413 et seq. (1910).

regulate, and enforce compliance with the provisions contained in the Public Service Commission Law. *See* 1955 Md. Laws, ch. 441. For instance, since its inception the statute has continually authorized the imposition of fines against personnel of the Commission or agents or officers of public service companies who violate the provisions of the statute. *See* Md.Code, § 13–101 et seq. of the Public Utility Companies Article (1998); Md.Code, Art. 78 § 101 (1957, 1995 Repl. Vol.); 1955 Md. Laws, ch. 441, § 94; Md.Code, Art. 78 § 69 (1951); Md.Code, Art. 23 § 410 (1939); Md.Code, Art. 23 § 402 (1924); Md.Code, Art. 23 § 456 (1912); 1910 Md. Laws, ch. 108, § 39.

In 1998, the General Assembly repealed the Public Service Commission Law contained in Article 78 of the Maryland Code and recodified those provisions in the creation of the Public Utility Companies Article of the Maryland Code. *See* 1998 Md. Laws, ch. 8.[7] The current law requires "[a] public service company [to] furnish equipment, services, and facilities that are safe, adequate, just, reasonable, economical, and efficient, considering the conservation of natural resources and the quality of the environment." Md.Code, § 5–303 of the Public Utility Companies Article.[8] In order to achieve these goals, the General Assembly vested the Commission with broad supervisory and regulatory powers. The jurisdiction of the Commission extends to "each public service company that engages in or operates a utility business in the State ...". Md.Code, § 2–112(a) of the Public Utility Companies Article

---

**7.** The Floor Report for Senate Bill 1, embodied in Chapter 8 of the 1998 Laws of Maryland expressly stated that the recodification did not make any substantive changes to the law.

**8.** The statute defines a public service company as "a common carrier company, electric company, gas company, sewage disposal company, steam heating company, telegraph company, telephone company, water company, or any combination of public service companies." Md.Code, § 1–101(p). A telephone company is defined as "a public service company that: (i) owns telephone lines to receive, transmit, or communicate telephone or teletype communications; or (ii) leases, licenses, or sells telephone or teletype communications." Md.Code, § 1–101(bb). Cellular telephone service providers are not considered telephone companies for purposes of the statute. *See* Md.Code, § 1–101(bb)(2) of the Public Utility Companies Article.

(1998). The powers of the Commission are those "specifically conferred by law" and "the implied and incidental powers needed or proper to carry out its functions" as established by the Public Utility Companies Article. § 2–112(b). The Commission is charged with the following responsibilities:

(a) *In general.*—(1) The Commission shall:

(i) supervise and regulate the public service companies subject to the jurisdiction of the Commission to:

1. ensure their operation in the interest of the public; and

2. promote adequate, economical, and efficient delivery of utility services in the State without unjust discrimination; and

(ii) enforce compliance with the requirements of law by public service companies, including requirements with respect to financial condition, capitalization, franchises, plant, manner of operation, rates, and service.

(2) In supervising and regulating public service companies, the Commission shall consider the public safety, the economy of the State, the conservation of natural resources, and the preservation of environmental quality.

(b) *Construction.*—The powers and duties listed in this title do not limit the scope of the general powers and duties of the Commission provided for by this article.

Md.Code, § 2–113 of the Public Utility Companies Article.

The Commission may promulgate regulations as necessary to fulfill its mission and may conduct investigations of its regulated entities. *See* Md.Code, §§ 2–115(a) and 2–121 of the Public Utility Companies Article. The Commission also serves a legislative function in its advisory role to the Governor and the General Assembly and conducts independent proceedings concerning proposed amendments to any laws which the Commission believes "would affect the public interest in any aspect of the business of a public service company." Md.Code, § 2–116(a) of the Public Utility Companies Article. The mandate of the Commission extends to injunctive relief when it determines that a public service company is violating

the provisions of the Public Utility Companies Article. *See* Md.Code, § 2–117 of the Public Utility Companies Article.

The statute also allows the Commission to serve as a forum to address consumer complaints. Anyone may file a complaint with the Commission alleging a violation by a public service company. *See* Md.Code, § 3–102(a). The traditional rules of evidence and procedure are not applicable at hearings conducted before the Commission. *See* Md.Code, § 3–101(b). In most other respects, the Commission's ability to conduct hearings mirrors the processes available in the judicial system. For example, the Commission, a commissioner, or a hearings examiner "may conduct hearings, examine witnesses, administer oaths, and perform any other acts necessary to the conduct of proceedings." Md.Code, § 3–104(b) of the Public Utility Companies Article. The Commission may issue subpoenas to compel witness attendance and the production of documents. Md.Code, § 3–109(a). Parties to proceedings before the Commission may call witnesses, present evidence, cross-examine witnesses and present argument to the fact finder, and take depositions. *See* Md.Code, § 3–107 of the Public Utility Companies Article. For all hearings conducted before the Commission, an official record containing a transcript of the testimony given and the exhibits offered before the Commission will be made. *See* Md.Code, § 3–111 of the Public Utility Companies Article.

█ Once the Commission has entered a final decision or order in a matter, any party may seek judicial review of the administrative decision or order in the circuit court. *See* Md.Code, § 3–202(a) of the Public Utility Companies Article. The circuit court's review is limited in scope as follows:

Every final decision, order, or regulation of the Commission is prima facie correct and shall be affirmed unless clearly shown to be:

(1) unconstitutional;

(2) outside the statutory authority or jurisdiction of the Commission;

(3) made on unlawful procedure;

(4) arbitrary or capricious;

(5) affected by other error of law; or

(6) if the subject of review is an order entered in a contested proceeding after a hearing, the order is unsupported by substantial evidence on the record considered as a whole.

Maryland Code, § 3–203 of the Public Utility Companies Article; *see Baltimore Gas & Electric Co. v. McQuaid,* 220 Md. 373, 382, 152 A.2d 825, 829–30 (1959)(explaining that judicial scrutiny would be limited to "finding whether there was illegality or unreasonableness in the Commission's action"); *Pub. Serv. Comm'n v. Baltimore Transit Co.,* 207 Md. 524, 531, 114 A.2d 834, 836 (1955). The circumscribed nature of judicial review arises from the fundamental doctrine of separation of powers as set forth in Article 8 of the Declaration of Rights of the Maryland Constitution:

That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other.

Md.Code, Art. 8 of the Declaration of Rights, Constitutions Article (1958, 1981 Repl. Vol.). We expounded upon Maryland's separation of powers doctrine in the context of the relationship between the judiciary and administrative agencies in *Dep't of Natural Resources v. Linchester Sand and Gravel Corp.,* 274 Md. 211, 334 A.2d 514 (1975) as follows:

When faced with the responsibility of juxtaposing a statute which provides for judicial review of administrative agencies with the separation of powers doctrine as it is enshrined in the Maryland Constitution, it is clear that the analysis involves contrasting the relative role of the administrative agency process with that of the judiciary. We note initially that both the agencies and the courts are governmental ministries created to promote public purposes, and in this sense they are collaborative instrumentalities, rather than rivals or competitors, in the paramount task of safe-

> guarding the interests of our citizens. However, the agencies and the courts each have their own, separate, constitutionally—erected fortress of power and responsibility in the relationship each has to the activities delegated by the Legislature to administrative agencies.

*Id.* at 221, 334 A.2d at 521–22. Furthermore, the judiciary must also be mindful of the level of technical and regulatory expertise the agency possesses. *See Potomac Edison Co. v. Pub. Serv. Comm'n*, 279 Md. 573, 582, 369 A.2d 1035, 1041 (1977); *Spintman v. Chesapeake & Potomac Tel. Co.*, 254 Md. 423, 429, 255 A.2d 304, 307 (1969)("The soundness of having such matters originally determined by a commission of persons qualified to evaluate the issues in a specialized field lies beyond dispute"). The importance of judicial deference to agency decisions becomes more readily cognizable where the statutory scheme sets up an efficient process for gathering information and developing policies to regulate a particular business enterprise which has wide-spread effects on the general public and for which specialized technical knowledge may be required in order to administer the statute and reach its intended goals.

Throughout the many versions of the Public Utility Companies Article or former Public Service Commission Law, the General Assembly never gave the Commission the ability to act as an adjudicatory body or quasi-judicial entity with regard to what would ordinarily be considered common law claims that existed at the time of the statutory enactment, and which continue to be viable today. The design of the Public Utility Companies Article does not reflect an intent to abrogate common law causes of action brought by consumers of the services offered by public service companies.

■ Rather, the Commission was designed to regulate the provision of services to consumers in specific arenas. As has long been held, where the Public Utility Companies Article sets forth the process for a hearing concerning the areas of regulation within its purview, that process ought to be followed. *See Spintman*, 254 Md. at 428, 255 A.2d at 307; *Poe v.*

*City of Baltimore,* 241 Md. 303, 311, 216 A.2d 707, 711 (1966); *Gager v. Kasdon,* 234 Md. 7, 9–10, 197 A.2d 837, 838 (1964), *appeal dismissed,* 379 U.S. 13, 85 S.Ct. 120, 13 L.Ed.2d 24 (1964); *Shpak v. Mytych,* 231 Md. 414, 417, 190 A.2d 777, 779 (1963). Long ago, we explained the nature of the PSC's functions by stating:

> As a fact-finding body, representing the State in the supervision and control of public utilities corporations, the Public Service Commission has been provided by the Legislature with a staff of trained assistants and specialists for the very purpose of furnishing a sound foundation of facts for every finding by the Commission. The Courts have no such facilities or equipment to function in this field of governmental control over public utilities, and will not disturb the Commission's findings where there appears substantial evidence to support them. *Public Service Commission v. Byron,* 153 Md. 464, 471, 138 A. 404; *Baldwin v. [West] Public Service Comm.,* 160 Md. 202, 152 A. 907; [West] *Public Service Comm. v. Williams,* 167 Md. 316, 173 A. 259.

*Bosley v. Quigley,* 189 Md. 493, 507–08, 56 A.2d 835, 842 (1948), *cert. denied,* 334 U.S. 828, 68 S.Ct. 1339, 92 L.Ed. 1756 (1948)(quoting *Mayor and Council of Crisfield v. Pub. Serv. Comm'n,* 183 Md. 179, 186, 36 A.2d 705, 708 (1944)).

In the matter now before us, Intercom asserts that it could not obtain its requested relief in the form of compensatory and punitive damages if it were to rely solely on the administrative remedy provided by the Public Utility Companies statute and argues that it need not exhaust the administrative remedies set forth in the Public Utility Companies Article prior to adjudication of its independent judicial action. Bell Atlantic, however, relies upon the holding of *Bits "N" Bytes v. Chesapeake & Potomac Tel. Co.,* 97 Md.App. 557, 631 A.2d 485 (1993), *cert. denied,* 333 Md. 385, 635 A.2d 425 (1994), in support of its proposition that the PSC serves as the exclusive forum for consumer complaints regarding the provision, adequacy, and pricing of telephone service.

In *Bits "N" Bytes,* the Court of Special Appeals stated that, "[p]ursuant to the doctrine of exhaustion of administrative remedies, a party's *exclusive* initial remedy is the statutorily proscribed administrative procedure; usually, as here, a party's only recourse to the courts is by limited judicial review of the administrative procedure. Thus, we can hardly wait to 'another day' to determine if the PSC remedy is exclusive; we have already determined that question." *Id.* at 571–72, 631 A.2d at 493 (emphasis in original). The Court of Special Appeals in *Bits "N" Bytes* held that the statutory remedies available under the Public Service Commission Law were exclusive and barred judicial consideration except in the form of the limited judicial review available under the statute. *See id.* at 575, 631 A.2d at 495. With regard to the question of exhaustion of administrative remedies, the court in *Bits "N" Bytes* held that where an applicable statutory remedy was available, "an administrative agency's lack of power to award certain forms of relief sought by a party does not relieve the party of its obligation to 'invoke and exhaust' the administrative remedy." *Id.* at 570–71, 631 A.2d at 492–93.

The Court of Special Appeals further relied upon this "general exhaustion of remedies rule" for its holding in *Vicente v. Prudential Ins. Co. of America,* 105 Md.App. 13, 16, 658 A.2d 1106, 1107 (1995)(holding that the Unfair Trade Practices subtitle of the Insurance Code provided the exclusive remedy for insureds seeking redress against their insurer for alleged acts of fraud, negligent misrepresentation, and negligent supervision). We explicitly overruled *Vicente* with our decision in *Zappone,* 349 Md. at 66, 706 A.2d at 1070–71. In *Zappone,* we explained that "[o]rdinarily a statutory administrative and judicial review remedy will be treated as exclusive only when the Legislature has indicated that the administrative remedy is exclusive or when there exists no other recognized alternative statutory, common law, or equitable cause of action." *Id.* at 62, 706 A.2d at 1068. We concluded that in the absence of these factors, the presumption would rest in favor of primary jurisdiction. *Id.* at 63, 706 A.2d at 1069. Contrary to the Court of Special Appeals's holding in

*Bits "N" Bytes,* the administrative remedy available under the Public Utility Companies Article was not intended to be the exclusive remedy for consumers who have complaints against public service companies.

Although the PSC only has primary rather than exclusive jurisdiction over consumer complaints, consumers must exhaust their administrative remedies before proceeding with an independent judicial action. *See McCullough v. Wittner,* 314 Md. 602, 606, 552 A.2d 881, 883 (1989). The *McCullough* case involved the purview of the Inmate Grievance Commission pursuant to Maryland Code, Art. 41, Section 4–102.1 (1957, 1986 Repl. Vol., 1988 Cum.Supp.), which specifically stated: "No court shall entertain an inmate's grievance or complaint within the jurisdiction of the Inmate Grievance Commission unless and until the complainant has exhausted the remedies as provided in this section." Maryland Code, Art. 41, § 4–102.1(*l* ). In *McCullough,* an inmate sued a correctional officer for claims arising out of an alleged assault and battery, seeking compensatory and punitive damages. *See McCullough,* 314 Md. at 605, 552 A.2d at 882. Although the Inmate Grievance Commission could award monetary damages only to the extent that funds had been appropriated to the Commission for that purpose, and would otherwise be limited to providing equitable relief, McCullough was required to first invoke and exhaust the administrative remedies set forth in the statute prior to a judicial adjudication of his tort claim. *See id.* at 608, 552 A.2d at 884. The basis of our holding was in the language of the statute and the legislative intent behind the formation of the Commission, for as we explained:

the necessity for invocation and exhaustion of administrative remedies could not have been more forcefully expressed in the statute. The General Assembly mandated that "[n]o court shall entertain an inmate's grievance or complaint within the jurisdiction of the Inmate Grievance Commission unless and until" the inmate has invoked and exhausted his remedies before the Commission. Art. 41, § 4–102.1(*l* ). This sweeping language, delineating the need to invoke and exhaust the administrative remedy, is totally inconsistent

with the notion that the Commission's jurisdiction over inmate grievances can be circumvented by the simple expedient of making a claim for money damages.

*McCullough,* 314 Md. at 609, 552 A.2d at 884.

■ Unlike the statutory provision involved in *McCullough,* the Public Utility Companies Article is not so explicit in its language requiring exhaustion of administrative remedies. The statute simply requires that consumers initially lodge their complaints with the Commission pursuant to Section 3–102 of the Public Utility Companies Article. Although the language of the judicial review provision embodied in Section 3–202 of the Public Utility Companies Article does not use language as specific as that at issue in *McCullough v. Wittner,* concerning exhaustion of administrative remedies, the need for exhaustion applies with equal force and effect so long as the agency has primary jurisdiction over the matter. Therefore, where a matter involves those areas within the jurisdiction of the PSC, either in whole or in part, a party may not circumvent the administrative agency's review simply by filing an independent judicial action seeking compensatory and punitive damages. *See Stillman & Dolan, Inc. v. Chesapeake & Potomac Tel. Co.,* 30 Md.App. 179, 193, 351 A.2d 172, 180 (1976).

■ The PSC remains a regulatory body, which the legislature did not expressly invest with power to resolve all questions put before it by citizens or businesses affected by the operation of public service companies. *See Comm'rs of Cambridge v. Eastern Shore Pub. Serv. Co.,* 192 Md. 333, 339, 64 A.2d 151, 154 (1949). In the case *sub judice,* Intercom's complaint filed in its independent judicial action, as well as its complaints before the Commission, set forth common law causes of action arising out of Bell Atlantic's conduct in handling Intercom's business. However, many of the factual predicates upon which Intercom rests its claims are also issues which fall within the regulatory scheme established in the Public Utility Companies Article. For example, Intercom's claims concerning the functionality of the circuits provided by

Bell Atlantic, billing rates, and discriminatory pricing of service to a consumer are all issues which may be addressed by the Commission. *See* Md.Code, § 2–113 of the Public Utility Companies Article. Intercom's civil complaint also alleges a claim of tortious interference with contractual relations against Bell Atlantic in its assertion that Bell Atlantic intentionally engaged in activity to undermine Intercom's business operations. In support of its claim, Intercom asserts that Bell Atlantic, as a competitor in the internet service provider industry, was aware of Intercom's contractual relations with its customers for internet access, and that Bell Atlantic intentionally provided Intercom with substandard service and repairs, and overcharged Intercom on its accounts. While the pricing and provision of telephone service is at issue in both Intercom's claims before the PSC and in its tort action in the circuit court, the claim of intentionally tortious acts and the damages sought therein may be dealt with only in an independent action.

While the PSC may be able to resolve portions of Intercom's dispute with Bell Atlantic, other cognizable claims sounding in tort for compensatory and punitive damages arising out of the service contracts with Bell Atlantic cannot be resolved by the PSC. To deny Intercom a forum to advance its common law claims and obtain monetary relief would contradict the fundamental purpose of the Public Utility Companies Article—to regulate the service provided by companies such as Bell Atlantic in the public interest and to provide consumers of those services with the ability to take action and lodge complaints against public service companies.

Thus, a consumer first must file a complaint with the PSC and then may decide to file an independent judicial action. Thereafter, the trial court must stay the independent judicial action upon the request of either party until after final resolution of the administrative proceeding. *See Kim v. Comptroller of the Treasury*, 350 Md. 527, 537, 714 A.2d 176, 180 (1998)(quoting *Maryland–National Capital Park & Planning Comm'n. v. Crawford*, 307 Md. 1, 18, 511 A.2d 1079, 1087–88 (1986)); *Goicochea v. Langworthy*, 345 Md. 719, 729, 694 A.2d

474, 479, *cert. denied,* 522 U.S. 924, 118 S.Ct. 321, 139 L.Ed.2d 249 (1997)(explaining that in the medical malpractice arbitration context, where a tort action is filed in a circuit court before the arbitration process has concluded, the trial court should "stay the civil action pending the conclusion of arbitration proceedings" rather than to dismiss the case); *McCullough,* 314 Md. at 613, 552 A.2d at 886 (explaining that where an individual has both an administrative and a judicial remedy and the agency has primary jurisdiction over the matter, the trial court may retain jurisdiction during the pendency of the administrative proceedings). Such a procedure will ensure that the desire of the Commission to "have everyone feel that his complaint whether large or small, will have a patient and courteous hearing and an honest decision" will be achieved without leaving complainants who seek remedies beyond the scope of the Commission without a forum for redress. *See* First Report of the Public Service Commission of Maryland, December 31, 1910, at 33.

Based on our consideration of the statutory language and the legislative intent behind its enactment, we hold that consumers, such as Intercom, do have the ability to pursue an independent judicial action in addition to the administrative remedies provided by the PSC, provided that they exhaust their administrative remedies prior to adjudication of an independent judicial action. In so doing, we overrule the holding of the Court of Special Appeals in *Bits "N" Bytes,* to the extent that the court held that the statutory remedies provided under the Public Utility Companies Article were the exclusive remedies available to consumers who have complaints against public service companies.

Our holding that the Commission has primary jurisdiction over cases involving entities regulated by the Public Utility Companies Article allows many cases which are exclusively regulatory in nature to be resolved within the Commission. For those cases where a party pleads a common law cause of action, the Legislature having vested the Commission with primary jurisdiction will allow the agency to imprint the matter with its expertise in this area of law and public policy

while also providing consumers with a forum for cognizable common law claims for which they could not otherwise obtain adequate relief.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED WITH COSTS TO BE PAID BY THE PETI-TIONER.*